(40 South. 700.)

No. 15,661.

SCHNEIDER et al. v. LOCAL UNION NO. 60, UNITED ASS'N JOURNEYMEN PLUMBERS, GAS FITTERS, STEAM FITTERS, AND STEAM FITTERS' HELPERS OF THE UNITED STATES AND CANADA.

(Dec. 18, 1905. Rehearing Denied Feb. 12, 1906.)

1. TRADE UNIONS—OBLIGATION OF MEMBERS.

The obligation or pledge which an initiate in a labor union is required to take is to be construed with reference to the declared purposes of the organization, and is binding only in so far as those purposes are lawful and are to be attained by lawful means, and when such union attempts the accomplishment of an object which is foreign to the purposes for which it is organized, or attempts the accomplishment of those purposes by unlawful means, the initiate or member may properly say: "I entered into no such contract."

2. CONTRACTS—PUBLIC POLICY—INFLUENCING APPOINTMENT TO OFFICE.

Agreements which tend to injure the public service are opposed to the policy of the law and will not be enforced by the courts. Of this character are agreements to use one's influence to secure the election or appointment of a person to a public office, and those which restrict

the free exercise of the discretion vested in a public officer for the public good.

[Ed. Note.—For cases in point, see vol. 11, Cent. Dig. Contracts, § 577.]

3. SAME.

It is the duty of an officer having a power of appointment to make the best appointment in his power at the time the appointment is made, and it is against public policy that he should be deprived of the exercise of his best judgment by a contract previously made or an obligation previously assumed. Whatever may be the practice, appointments are, in theory, made for the public good.

4. TRADE UNIONS—RECOMMENDATION TO OF-FICE—DUTIES OF MEMBERS — SUSPENSION — REINSTATEMENT.

The fact that the labor union of which the plaintiffs are members recommended another member for an office, the appointment to which rests with a board of public officers, the members of which, in turn, are appointed by the mayor and council of New Orleans, imposed no obligation upon the plaintiffs, upon their subsequently becoming members of said board, to vote for the candidate recommended by their union; their obligations to the union and to the public being distinct from each other, and the latter being paramount. Hence their failure to vote for such candidate afforded no sufficient reason why their union should fine and suspend or boycott them, and they are entitled to relief, by injunction and by judgment remitting the fine imposed, reinstating them in the union, and condemning the union, and its officers and members who participated in its actions, in damages, actual and exemplary.

5. SAME—QUESTION FOR COURT.

The general rule is that a complaining member of an organization should exhaust the remedies provided by the laws of the organization before applying to the courts; but where those laws provide no remedy, and the organization provides none, but meets the demands therefor with futile correspondence and vexatious and unnecessary delays, it becomes a question for the courts to determine whether or not the member has done all within his organization that could reasonably be expected of him.

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; Thomas C. W. Ellis, Judge.

Action by Stevens Schneider and Edward Schekeler against Local Union No. 60, United Association Journeymen Plumbers, Gas Fitters, Steam Fitters, and Steam Fitters' Helpers of the United States and Canada. Judgment for plaintiffs, and defendants appeal. Affirmed.

William Stirling Parkerson, for appellants.

Boatner & Manion and Wynne Gray Rogers, for appellees.

Statement.

MONROE, J. The two plaintiffs above named, alleging similar causes of action against the same defendants, filed separate suits, which were subsequently consolidated and tried together, with the result that separrate judgments were rendered against the defendants, by whom separate appeals were taken, which have been brought before this court in the same transcript and docketed under the same number.

Plaintiffs allege that they have been members, in good standing, of Local Union No. 60 (of this city) of the United Association Journeymen Plumbers, Gas Fitters, Steam Fitters, and Steam Fitters' Helpers of the United States and Canada; that in 1902 the General Assembly of this state adopted Act No. 194 providing for a board of examiners of plumbers for the city of New Orleans, pursuant to the provisions of which the mayor named three master and two journeymen plumbers to constitute said board, and that the board as thus constituted organized upon August 26, 1903, and elected a plumbing inspector. Plaintiffs further alllege that at a meeting of Local Union No. 60, held upon August 28th following, a resolution was adopted imposing upon them each a fine of $25, with a threat of raising it to $150, and instructing the other members of the union not to work with them, as a consequence of which they were thrown out of employment and have so remained for the greater part of the time since then, thereby sustaining a loss in wages, each, of $259.

They further allege that they were not informed of or summoned to answer any charges, and, though they have demanded the same, have been unable to obtain either a statement of such charges or a hearing

thereon, and that their appeals to the United Association for redress have been fruitless. They further allege that, being dependent upon their labor, they gave to the proper officer orders covering the amounts of the fines imposed upon them, but that the union refused to receive them; that they have not violated the constitution or by-laws of the union; but that said union and the officers (naming them) have illegally and maliciously, and in violation of said constitution and by-laws, and of the laws and public policy of the state, thus fined and suspended them, with the purpose of injuring and preventing them from making a living. They further allege that their membership in said union is worth to each $5,000, that the unlawful action complained of, in addition to loss of wages, has injured them in feelings and reputation to the extent of $2,500, and that a continuance of the boycott against them will work injury that will be irreparable. Wherefore they pray that the defendants be enjoined from interfering with them in their business and from prohibiting or discouraging others from working with them, and that there be judgment maintaining said injunction, remitting the fine imposed upon them, reinstating them in the union, and condemning the defendants, in solido, in the sum of $5,259.

A preliminary injunction having issued as prayed for, the defendants answered, denying the allegations of the plaintiffs, save as specially admitted; admitting the imposition of the fines as alleged, but alleging that the same were imposed in accordance with the law of their organization; and praying that the injunction be dissolved and the suit dismissed.

It is undisputed that the plaintiffs were members in good standing of Local Union No. 60, which, in turn, was and is a member of the "United Association of Plumbers," etc. It is a fact that in 1902 the General Assembly passed a law for the establishment of a board of examiners of plumbers in cities having 30,000 or more inhabitants, each board to consist of five plumbers (including two journeymen), together with the health officer and engineer of the city in which it is established, the members, other than those last above mentioned, to be appointed by the mayor, with the consent of the council of such city. The act further provides that each board so constituted shall appoint one or more inspectors, to whom certain duties are assigned, and it contains other provisions which need not be here enumerated. It appears that, in July, 1902, immediately after the act in question became a law, Local Union No. 60 held a meeting at which the following action, as recorded in the minutes, was taken, to wit:

"We have a secret ballot. Theodore Correjolles, Peter Llibert, E. Schekeler, E. C. Hawley, and Frank Robinson were placed in nomination, which resulted in Frank Robinson and Peter Llibert elected to act as board of examiners, and Theodore Correjolles to act as reserved member. Brothers Wm. McGilvray, Wm. Price, and E. Glennon were placed in nomination. Brother McGilvray was elected as chief inspector. Carried."

It seems, however, that the mayor and council of New Orleans were indisposed to be controlled in selecting their appointees, for they tendered the positions of journeymen members of the board to Messrs. Patterson and Ybos, who were also members of Local Union No. 60, and thereupon, in December, the organization resolved and ordered that "any member accepting positions on plumbers' board except regular appointed members of Local Union No. 60, be fined $100 and be expelled from the union," to which was added, "We tender Brothers Patterson and Ybos a vote of thanks for declining positions on plumbing board."

Thereafter, whether at the request of the mayor, or of its own motion, does not appear, on March 25, 1903, Local No. 60 sent its roster to the mayor (to quote the minutes), "so he can select two members for the

plumbing board"; the original motion to that effect having been amended to read (quoting again from the minutes):

"We leave out the following four names: Theodore Correjolles, Frank Robinson, W. Patterson, and L. Ybos."

Sò the mayor received the roster of the union, less the names of Patterson and Ybos, who had already, in view of the persuasive action of the union, declined the appointments, and those of Correjolles and Robinson, whom he had already declined to appoint, and he selected therefrom the names of the plaintiffs, to whom he gave the appointments, which action was approved by the union on April 9, 1903; the minutes of the meeting of that day reading:

"The names selected by the mayor of the two members of Local No. 60 to act as members of plumbing board be indorsed by this local. Carried."

It further appears that the union afterwards found some reason to doubt whether the plaintiffs, who had thus become public officials, would see their way, in the discharge of the obligations which they had assumed to the community at large, to voting for McGilvray as inspector, and it accordingly on April 23, 1903, resolved that "Brother Schekeler and Brother Schneider be instructed to vote for Local No. 60's candidate for inspector," to which was added: "We give Brother McGilvray credentials as candidate No. 60 for plumbing inspector." And this, apparently, not producing the desired effect, the union, on August 25, 1903 (the night before that upon which the board was to select the inspector, adopted the following:

"Motion by Knable, and seconded by Sutherland, that the two members of L. U. No. 60 who were appointed on the plumbing board be fined $25 and, with the sanction of the executive committee, of the U. A. the fine be increased to $150, if they do not vote for Brother William McGilvray as inspector of plumbing for the city of New Orleans. Any other member outside of McGilvray, taking the position of plumbing inspector, be fined same as two members of plumbing board. Any member taking position of plumbing inspector be expelled from local."

The plaintiffs nevertheless persisted in ignoring McGilvray, and voted for men who (plaintiffs say) were, in their opinions, better qualified for the position; Schekeler voting for one O'Dowd, and Schneider voting for Glennon, lately president of the union. The union thereupon (on August 27th) ordained that "the constitution and by-laws be enforced in regard to Brothers Schekeler and Schneider in regard to their action on the board of examiners," and on September 14th it became more explicit, as will appear from the following excerpt from its minutes, to wit:

"President De Leon ruled that members who worked in shops with E. Schekeler and S. Schneider, after knowing that said men were working in said shops, be fined not less than $5. So ordered. Brother William O'Brien appealed from the decision of the chair, after which a vote was taken, and the chair was sustained by a vote of 32 to 5. So ordered. Moved and seconded that Brothers who had worked with E. Schekeler and S. Schneider on Monday September 14th be fined the amount of two days' wages, and if they continued to work with said men on Tuesday, September 15, 1903, they be fined the sum of $25 each additionally. Amendment. That fine so collected be paid to brothers who quit work on account of Schekeler and Schneider," etc.

This action resulted in the discharge of the plaintiffs by their employers, and they, then, busied themselves in an effort to obtain relief, first, through Local Union No. 60, and later through the United Association, as follows:

(1) On August 29th a petition bearing the signatures of 6 members in good standing was addressed to the officers and members of the union praying that a special meeting be called on August 31st to reconsider the action taken in the case of Brothers Schekeler and Schneider. (2) On September 1st a petition bearing the signatures of 12 members in good standing was addressed to the officers and members of the union praying that a special meeting be called for September 2d to receive communication and committee from the

board of examiners of plumbers. (3) A petition, the date of which does not appear, bearing the signatures of 29 members in good standing, was addressed as the others had been, praying that a special meeting of the union be called for September 4th to receive committee and communication from the board of examiners of plumbers, and also to reinstate Messrs. Schekeler and Schneider and allow them to pay the fine of $25 each under protest, and appeal their case to the executive board. In this connection it is proper to note that, shortly after the fines were imposed, the plaintiffs each gave to the authorized officer of the union an order upon his employer for the amount of the fine, which orders were returned to them, by instructions from those higher in authority, and by the same authority the boycott against them was thereafter persisted in. The first of the petitions above mentioned was given to Wm. Donegan, one of the defendants, and is not otherwise accounted for. The petition next mentioned, signed by 12 members, was delivered to the secretary of the union, and, no action having been taken, the plaintiffs on inquiry were informed by the president or acting president that the meeting would not be called because there was a counter petition out, signed by 17 members. The petition last mentioned, signed by 29 members, was delivered to the secretary and (to quote the testimony of the plaintiff, Schekeler, corroborated by Schneider and contradicted by no one):

"A special meeting was called to meet at the Odd Fellows Hall. When they assembled there it was found that they had no room to meet in. I think Mr. Matthews and other members went to a hall in Exchange Alley and hired it, and said, 'Go there.' But the acting president at the time, Mr. De Leon, says, 'This is where the meeting is to be called for.' I didn't hear it myself, because I was at the corner. (Objection.) Q. You were not invited to proceed down to Exchange Alley, were you? A. No, sir. Q. Was there a meeting held that night? A. No, sir. Q. Was that due to any fault of yours? A. No, sir. * * * Q. You were ready to attend any meeting? A. Yes, sir. I

was standing half a block away, waiting for the meeting to be called. There were about 20 men with me. Q. How many men were there ready to attend the meeting? A. I guess nearly all the association, 75 or 80. Q. And no meeting was held that night? A. No, sir."

Schneider estimates the number present at a somewhat lower figure, and otherwise corroborates the testimony of Schekeler, and states that he, like Schekeler, was on hand. No further steps were taken by the officers to convene the union, and on September 3d plaintiffs' counsel (Mr. Manion) wrote a long letter to the general secretary of the United Association, fully explaining the situation and asking that the matter be acted on. To this letter he received a reply, dated September 8th, in which the writer (the secretary and treasurer of the United Association), after acknowledging Mr. Manion's letter and the receipt of a copy of the act of 1902, said:

"Before we can proceed with this case, it will be necessary to consult the other side, which will be done by this mail. As soon as a reply is received, you will be promptly informed."

Hearing nothing more from either the union or the association, the plaintiff Schekeler, on September 16th, wired the general secretary:

"Cannot get the union to act in my case. Can get job in nonunion shop; shall I take it till my case is finally decided by you. Wire answer at once. Collect."

And to this telegram the secretary replied, September 16th:

"Can't find anything on file about your case. Letter follows, also inquiry to Local 60."

On September 25th plaintiff's counsel, who had been temporarily absent, wrote to the secretary (after referring to the telegram of September 15th), saying:

"To their [plaintiffs'] surprise, you answer on the 16th inst., 'Can't find anything on file about your case. Letter follows, also inquiry to Local 60.' And on the same date your note that nothing could be found on your files concerning the case was a piece of information sufficient to astound and force them to relinquish all hope of redress, in face of yours, dated 8th inst., addressed to me, wherein you

acknowledge receipt of mine of 23d ult., with copy of Act No. 194. In this letter I placed the whole matter before you."

The writer then restates the case, and concludes as follows:

"We want fairness, and do not wish to be driven to the courts for redress; * * * but the time is rapidly approaching when we will have to call the union into court."

The matter it seems finally reached the executive board of the United Association, which disagreed about it on a tie vote and referred it to the president, who remitted it back to the secretary, with a suggestion that it be reopened, and the secretary, on October 7th, wrote to Schekeler:

"I will be greatly obliged if you will present this letter to Mr. Schneider, and then have him write up a statement of his side of the case, and you write up another, and I will ask No. 60 to write up their side, and we will make a new proposition of it to the board."

Mr. Manion, for the plaintiffs, accordingly forwarded another statement of the case to the secretary, but "No. 60," instead of "writing their side," invited the plaintiff, Schekeler, to make a statement of his case, in the presence of their (the union's) executive committee; but, as Schekeler proposed to make the statement through his legal adviser, and the committee declined to receive it in that way, the matter ended, and on October 22d the union adopted a resolution that "letter from Martin H. Manion, in regard to Schekeler and Schneider case, be thrown into the waste basket"; the letter in question containing an offer to submit the matter to arbitration, the union to name one arbitrator and to select the other from six persons to be named by plaintiffs. Finally, reaching the conclusion that no relief would be afforded them, the plaintiffs upon November 19th brought these suits.

In addition to the facts thus stated it may be said, upon the authority of their constitution, by-laws, etc., that the declared purpose of the members of the union in effecting their organization is to protect themselves from unjust and injurious competition, and to secure, through the power of organization, a steady demand and fair compensation for their labor and a position in society to which as wealth producers and citizens they are entitled. The pledge required of all initiates, and taken by the plaintiffs, is as follows:

"I, ———, in the presence of the members of this association, do truly promise and pledge my word of honor that I will yield obedience to all laws and legal summons that may be sent, said, or handed to me. I will not do any act in any way prejudicial to the best interest of this association, but will at all times endeavor to promote its prosperity and usefulness. I will at all times assist members of this association to the extent of my ability, defend them when unjustly treated or slandered, and cultivate for each and every member the warmest friendship and brotherly love. I will assist unfortunate or distressed members to procure employment and to secure just remuneration. I do further promise that I will never reveal any of the signs or workings of this association that may be now or hereafter confided to me, except in a lawful and authorized manner. I take this obligation voluntarily, without any mental reservation, and bind myself until death or honorable withdrawal, under the penalty of the scorn due to moral perjury and violated honor, as one unworthy of trust or assistance."

Upon the facts thus stated (and possibly a few others which may be hereafter referred to), the judge a quo gave judgment in favor of the plaintiffs, respectively, and against the defendants, Local Union No. 60 and various named officers of said association who participated in the action complained of, maintaining the preliminary injunction which had been issued, ordering that the plaintiffs be reinstated in said Local Union No. 60, and the fines imposed upon them set aside, and condemning said defendants in solido, in favor of the plaintiff Schekeler in the sum of $482, with interest from the rendition of the judgment, and in favor of the plaintiff Schneider in the sum of $466, with interest. And from the judgments so rendered the defendants have appealed.

### Opinion.

The obligation which initiates of Local Union No. 60 are required to take is to be

construed with reference to the declared purposes of the organization, and is binding on the initiate only in so far as those purposes are lawful and are to be attained by lawful means. When the union attempts the accomplishment of an object which is foreign to those purposes, or attempts the accomplishment of those purposes by unlawful means, the initiate may properly say: "I entered into no such contract." The union's rules of order specifically provide that "partisan politics or sectarian discussion shall not be permitted in the meetings under any circumstances." The introduction of a resolution committing the organization to the support of a particular political party or a particular dogma of religion would therefore be a violation of a fundamental law of the union, as construed by the union, and its adoption would impose no obligation on its members, and it must be read into those rules that the introduction of a resolution which is violative of the fundamental law of the land has no better foundation and its passage no greater effect. "The courts will not enforce an agreement the object of which is forbidden by law or is opposed to the policy of the law. * * * The following are the leading classes of agreements contrary to the policy of the law: (1) Agreements which tend to injure the public service. Of this character is an agreement to use one's influence to secure the election or appointment of a person to a public office. Gaston v. Drake, 14 Nev. 175, 33 Am. Rep. 548; Nichols v. Mudgett, 32 Vt. 546; Gray v. Hook, 4 N. Y. 449; Filson's Trustee v. Himes, 5 Pa. 452, 47 Am. Dec. 422. * * *" Principles of Contracts (Benjamin) pp. 89, 90.

This elementary doctrine is more fully stated in the brief of the counsel for the plaintiffs in the form of excerpts from what we take to be a recent work on Public Policy (Greenhood) as follows:

"Any contract which contemplates conduct which will amount to an imposition upon a public officer in the exercise of his discretion is void. * * * Any contract by one acting in a representative capacity, which restricts the free exercise of a discretion vested in him for the public good, is void. * * * Any contract to appoint to a public office, or involving the sale of a public office, or quasi public office, or to do anything in consideration of the promisee exchanging offices, or securing an office for the promisor, or recommending him for such office, or resigning any office, is void. * * * It is the duty of the officer, having a power of appointment, to make the best appointment in his power, at the time when he makes the appointment. The public have a right to demand this, and it is against public policy that he should be deprived of the exercise of his best judgment by a contract previously made. If he has promised the office to one person, and has since discovered that the public will be better served by another, he must be at liberty to make the better appointment, and that, too, although no such absolute disqualification may exist in regard to the person to whom it was first promised as would constitute a defense to an action in damages if such action could be maintained on the promise. Whatever may be the practice, appointments are, in theory, made for the public good. That is the reason why the appointee may not purchase the office. In a similar way, though not to the same extent, the public good would be injured if a promise to make an appointment were held to be legally binding, so as to control the exercise of that judgment which the appointing officer ought to exercise when he makes the appointment. The right of appointment is not the property of the appointing officer, and he has no right to barter it or to dispose of it. It is merely a political power intrusted to him to be exercised, not to be sold. * * * Any contract by which * * * the liberty of an elector to vote according to his conscience is restricted, or which contemplates the use of improper influence upon such elector, or is calculated to exercise an injurious influence over the purity of elections in the state, or in another state, is void."

Referring to Greenhood on Public Policy, pp. 336–339, 387.

If, therefore, the appointment of McGilvray, rather than of some other and perhaps more competent man, to the position of inspector, could be considered as furthering the purposes for which the defendant herein was established, nevertheless the attempt to secure that appointment, by threatening and imposing fine and suspension, in their capacity as members of the union, upon public officials charged with such appointment, was a violation of law; and this, whether those officials, as members of the union, had committed

themselves to McGilvray's candidacy or not. But we are unable to concur in the view, relied on by the learned counsel for the defendant, that the plaintiffs had so committed themselves. The union, in July, 1902, adopted a resolution indorsing McGilvray for the position of inspector. It is not altogether certain that the plaintiffs were present when that action was taken, and, if we assume that they were, we may also assume (in view of the fact that there were two other candidates, including Glennon, for whom one of the plaintiffs, as a member of the board of examiners, subsequently voted), that the plaintiffs voted against him, thereby expressing the opinion that, even as between the three whose names were presented, he was not the best man for the place. At that time, however, it does not appear that the selection of the plaintiffs to membership of the board having the appointing power was in contemplation, and the proposition that, by being absent from the meeting or by voting against the indorsement of McGilvray, they committed themselves to the position that, if they should at any time thereafter attain such membership, they would vote for him is untenable, since they knew, and the union knew, that the power to place them on the board was not vested in the union; that when, if ever, they should be placed there, it would be as public officials, assuming and owing a paramount duty with respect to the selection of an inspector to the community at large; and that they could not, legally or morally, tie themselves up in such a manner as to prevent their discharging that duty by exercising their best judgment in the matter of such selection. We infer that, as the ultimate result of its action, in July, 1902, the union suggested the appointment of Correjolles and Robinson as members of the board of examiners, and the record shows that the mayor declined to appoint them and tendered the appointments to Pat-terson and Ybos, who were compelled by the union to decline them. Some seven or eight months later (in March, 1903), the union sent to the mayor its roster in order to enable him to select from it, for himself, the two appointees for whom he was looking. Whether the roster was sent at the request of the mayor, or by the union of its own motion, we are not informed; nor do we know but that the mayor was provided, at the same time, with the names of all the nonunion plumbers in the city, since there is nothing in law which excludes them from the board. However that may be, it is quite certain that the union understood that the mayor would make his own selection, and that all he needed from it was the names of its members. Under these circumstances, there was nothing for the union to do but send a correct roster, or none, since to have sent an incorrect one would have been to have practiced a fraud. The plaintiffs were therefore under no obligation to the union in that connection, as their names were on the roster as a matter of right, and not of favor, and the union in sending the roster did no more for them than it did for those members, constituting the large majority, whom the mayor did not select and could not have selected. It seems to us, then, to be illogical to argue that the plaintiffs are in the attitude of having secured their appointments as members of the board by holding out that, if appointed, they would vote for McGilvray for inspector, since it is not pretended that they so held out to the mayor, who appointed them, and the union, to whom the holding out is (erroneously, as we think) said to have been made, neither appointed them nor controlled the appointments.

Defendants' counsel earnestly contends that plaintiffs should have exhausted their remedy within the organization of which they are members. Conceding, arguendo, that the gen-

eral rule to that effect is applicable to a case in which the organization is acting in violation not only of the law of its being, but of the law of the state, we are nevertheless of the opinion that the plaintiffs have brought themselves fairly within that rule. We find no provision for the trial of such matters as this either in the constitution or by-laws of Local Union No. 60, nor in those of the United Association, and the efforts of the plaintiffs to induce those organizations to make the necessary provision and in some way give them a trial resulted in nothing but futile correspondence and vexatious delay, with no prospect of relief from a situation which, to men dependent for themselves and their families upon their daily earnings, had become little short of desperate.

As to the damages, counsel for defendant, calculating from the evidence, reaches the conclusion that Schneider lost in wages $96, and Schekeler $192, and, as the judgment appealed from awards the one defendant a total of $466, with interest from its rendition, and the other $482, with interest, it is said that the judgments should be amended in that respect.

The amounts thus awarded represent, however, not only the damages sustained by reason of loss of wages, but also those resulting from mental suffering and injury to reputation, and likewise included $200 awarded to each plaintiff as punitory damages. We agree with the trial judge that his estimates are conservative, and find no sufficient reason for reducing the totals as thus allowed.

It is therefore ordered, adjudged, and decreed that the judgment rendered in the consolidated cases of Stevens Schneider v. Local Union No. 60, United Association Journeymen Plumbers', etc., et al. and Edward Schekeler v. Same Defendants, and herein appealed from, be, and the same are, hereby affirmed, at the cost of the defendants.