EASTON TRACTOR AND EQUIPMENT COMPANY, INC., AND RUTH M. EASTON, LIQUIDATOR OF EASTON TRACTOR AND EQUIPMENT COMPANY, INC., PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 79891, 79892.   Promulgated December 18, 1936.

*Ed. J. de Verges, Esq.,* and *Sol Weil, C. P. A.,* for the petitioner.
*Lloyd W. Creason, Esq.,* for the respondent.

### OPINION.

TYSON: These consolidated proceedings seek redetermination of income tax deficiencies in the amounts of $624 for 1930, $390.75 for 1931, and $692.54 for 1932. That part of the deficiency asserted for the year 1931 growing out of the disallowances of $231.25 for donations and $625 for campaign contributions is not in controversy.

Petitioners assign error in the respondent's disallowance of a claimed deduction in each of the years 1930 and 1931 for the amount of commissions paid to H. R. Brothers on sales of tractors to the

Louisiana State Highway Commission based upon respondent's determination that such commissions did not constitute ordinary and necessary business expense. Petitioners also assign error in the respondent's disallowance of a claimed bad debt deduction in the amount of $10,073.32 for the year 1932.

The petitioner, Easton Tractor & Equipment Co., hereinafter called Easton, was during the taxable years a Louisiana corporation, with its principal office at Alexandria, Louisiana, and was at the time of the hearing herein in process of liquidation, with Ruth M. Easton, petitioner, as liquidator.

During the years here in controversy the petitioner, Easton, was engaged in the business of selling tractors and road machines. It was the exclusive agent of the Caterpillar Tractor Co. for making sales of that company's tractors in a territory embracing 40 parishes in the northern part of the State of Louisiana and as such was allowed a 20 percent discount from the list price on all tractors sold by it. Other agents of the Caterpillar Co. making sales of its tractors in Easton's territory were required to pay the latter certain commissions thereon. The petitioner, Easton, regularly employed four salesmen, other than R. H. Brothers, each of whom was paid a fixed salary and expenses, the total of which sometimes amounted to more and sometimes to less than 10 percent of the list price of tractors sold. Petitioner's entire exclusive territory was divided between those four salesmen.

During each of the years 1930 and 1931 the petitioner, Easton, employed R. H. Brothers as its agent at Baton Rouge, the state capital, and agreed to pay him a commission of 10 percent on all tractors sold by him on behalf of Easton to the Louisiana State Highway Commission. Baton Rouge was not in Easton's territory, but was in the territory of the New Orleans Tractor & Equipment Co., which employed Brothers in the same capacity as did petitioner.

The secretary and treasurer of the petitioner, Easton, testified in part as follows:

Q. Do you know of any reason why Mr. Brothers could make sales any better than or quicker or any more of them than any of the other ones of your salesmen?

A. Yes, I do.

Q. What were those reasons?

A. It was understood that Mr. Brothers was close to the administration—that any tractors sold would be—In other words that he could sell the tractors better than we could.

Q. When you say that "he was closer to the administration" you mean close to the State of Louisiana Administration, or government of that state?

A. That is what I understood.

Q. And because of the fact that he could facilitate these sales better than the others, is that right?

A. That is what I understood Mr. Easton to mean.

Q. Meaning by that, that he had some sort of inside connection or "pull" with the administration, which others did not have?

A. Well I do not know that.

Q. But that is your understanding?

A. That is my understanding from Mr. Easton, yes.

Q. And for that reason you employed him instead of leaving it to some of your regular employees?

A. That is what Mr. Easton advised.

The Mr. Easton referred to in the quoted testimony was the president of the petitioner, Easton, during the taxable years and at the time Brothers was employed, but was deceased at the time of the hearing herein.

Upon the whole record we conclude that Brothers was employed by the petitioner, Easton, for the reason that his personal influence with the administration or government of the State of Louisiana placed him in an advantageous position to make sales to the Louisiana State Highway Commission.

During 1930 and 1931 Brothers made a number of sales of tractors on behalf of the petitioner, Easton, to the Louisiana State Highway Commission. The tractors were billed to the highway commission at the regular list price plus freight, just as was done in the case of each other customer. At various times during those two years Brothers drew drafts on the petitioner, Easton, which were honored by that petitioner's checks, payable to the banks through which the drafts were presented. Brothers' drafts on Easton were frequently made in advance and in excess of the 10 percent commission on sales completed by him, but at other times Easton was indebted to him for commissions due. During 1930 and 1931 Easton paid to Brothers commissions in the amounts of $2,200 and $2,400, respectively, on sales made by him to the Louisiana State Highway Commission. In its income tax returns for those years the petitioner, Easton, claimed deductions for such amounts, respectively, as ordinary and necessary business expenses. Respondent has disallowed the deductions upon his determination that the amounts so paid to Brothers were not *ordinary* and *necessary* business expenses within the meaning of the revenue acts. The agreement under which Brothers made the sales to the highway commission for which he was paid the commissions above mentioned was entered into for the purpose of utilizing, in the making of said sales, the *personal influence* Brothers had by reason of being "close" to the state administration or government.

We are immediately led to a consideration of whether the agreement was void and unenforceable as contrary to public policy, as is urged by the respondent. The question of the validity of agreements made with agents for the procurement by the agents of contracts from governmental departments, or to influence legislation, has been presented to the courts in many cases and it is held by the

overwhelming weight of authority that when such agreements are made for the purpose of enlisting the exercise of the *personal influence* of the agent employed in securing such contracts with the Government or such legislation, the contract with the agent is void as against public policy.

A leading case on this subject is *Tool Co.* v. *Norris*, 2 Wall. 45. In that case, Norris was employed by the Tool Co. to obtain a contract for the sale to the United States Government through the Secretary of War of 25,000 muskets and was to be paid "in case he obtained a contract * * * for his services proportionate to its extent." Norris "then set himself to work * * * to getting letters from people who might be supposed to have influence with Mr. Cameron, at that time Secretary of War, recommending him and his objects" and "By one means and another", received influential introduction to the Secretary of War and "got the contract" for the Tool Co. Subsequently, the parties disagreed as to the amount of compensation to be paid Norris and he instituted suit for an amount claimed and obtained judgment therein. In reversing the judgment and holding the employment agreement to be against public policy, the Court said:

The question, then, is this: Can an agreement for compensation to procure a contract from the Government to furnish its supplies be enforced by the courts? We have no hesitation in answering the question in the negative. All contracts for supplies should be made with those, and with those only, who will execute them most faithfully, and at the least expense to the Government. Considerations as to the most efficient and economical mode of meeting the public wants should alone control, in this respect, the action of every department of the Government. No other consideration can lawfully enter into the transaction, so far as the Government is concerned. Such is the rule of public policy; and whatever tends to introduce any other elements into the transaction, is against public policy. That agreements, like the one under consideration, have this tendency, is manifest. They tend to introduce personal solicitation, and *personal influence*, as elements in the procurement of contracts; and thus directly lead to inefficiency in the public service, and to unnecessary expenditures of the public funds. [Italics ours.]

* * * all agreements for pecuniary considerations to control the business operations of the Government, or the regular administration of justice, or the appointments to public offices, or the ordinary course of legislation are void as against public policy, without reference to the question, whether improper means are contemplated or used in their execution.

In *Oscanyan* v. *Arms Co.*, 103 U. S. 261, Oscanyan sued the Arms Co. for $136,000 alleged to be due him as commissions on an agreement with the Winchester Repeating Arms Co. for the sales of fire arms to the Ottoman Government, effected through his influence. From a judgment for the defendant in the United States Circuit Court, Oscanyan appealed to the Supreme Court, which affirmed the judgment of the lower court. The pertinent facts in this case showed

that the Ottoman Government had sent to the United States a special representative of high rank to examine and report in regard to the purchase by that government of arms and machinery for its use. Oscanyan was Ottoman Consul in New. York and was a friend of the special representative, who made his headquarters in Oscanyan's office while in this country. Manufacturers soon became aware of the relation between the two men and one of them, a manufacturer of fire arms, the said Arms Co., agreed with Oscanyan to pay him commissions for the use of his influence in making sales to the Ottoman Government through the recommendations of his friend, its special representative. Such sales were made by Oscanyan and upon disagreement as to Oscanyan's compensation the suit followed. The Court quoted with approval the excerpt above set out from the *Tool* case, *supra*, and, in holding the contract of employment of Oscanyan to be void as against public policy, and, after consideration of that feature of the case showing that both Oscanyan and the special representative were officers of the Ottoman Government and that the contract was consequently a corrupt one, further said:

But, independently of the official relation of the plaintiff (Oscanyan) to his government, the personal influence which he stipulated to exert upon another officer of that government was not the subject of bargain and sale. Personal influence to be exercised over an officer of government in the procurement of contracts, as justly observed by counsel, is not a vendible article in our system of laws and morals, and the courts of the United States will not lend their aid to the vendor to collect the price of the article. Numerous adjudications to this effect are found in the State and Federal courts. This is true when the vendor holds no official relations with the government, though the turpitude of the transaction becomes more glaring when he is also its officer.

The agreement of the petitioner, Easton, with Brothers under which Brothers sold the Louisiana State Highway Commission tractors and received the commissions here involved was, under the authority of the above cited cases, void as against public policy, the agreement having been made with the obvious purpose of securing the exercise by Brothers of his *personal influence* with the state administration or government in making said sales. Cf. *Meguire* v. *Corwine*, 101 U. S. 108; *Hazelton* v. *Sheckells*, 202 U. S. 71; *Hayward* v. *Nordberg Manufacturing Co.*, 85 Fed. 4; *Gil* v. *Williams & Davis*, 12 La. Ann. 219; *Burney's Heirs* v. *Ludeling*, 47 La. Ann. 73; 16 So. 507; and *Schneider* v. *Local Union No. 60*, 116 La. 270; 40 So. 700.

We conclude that such commissions, having been paid on an agreement void and unenforceable because of its being in direct contravention of positive law, did not constitute such an ordinary and necessary expense as was contemplated by the applicable statute and the determination of the respondent in disallowing the deduction of such

commissions is therefore approved. Cf. *Great Northern Railway Co. v. Commissioner*, 40 Fed. (2d) 372; certiorari denied, 282 U. S. 855; *Burroughs Building Material Co.* v. *Commissioner*, 47 Fed. (2d) 178; *Chicago, R. I. & P. Ry. Co.* v. *Commissioner*, 47 Fed. (2d) 990; certiorari denied, 284 U. S. 618; *Mitchell M. Frey, Jr., et al., Executors*, 1 B. T. A. 338; *M. L. Heide*, 2 B. T. A. 451; *Bonnie Brothers, Inc.*, 15 B. T. A. 1231; *M. Rea Gano*, 19 B. T. A. 518; *Lawrence A. Wagner*, 30 B. T. A. 1099, and authorities cited therein; *Kelley-Dempsey & Co.*, 31 B. T. A. 351.

The second issue in these proceedings involves petitioners' claim of a bad debt deduction in the amount of $10,073.32 for the year 1932, which was disallowed by respondent. In 1932 the petitioner, Easton, held approximately $50,000 of certificates of indebtedness issued to it by the Louisiana State Highway Commission, which in that year was indebted to many other creditors in addition to Easton, in amounts aggregating a very large sum, for which amounts similar certificates of indebtedness had been issued. During 1932 the State of Louisiana Highway bonds were selling below par and in order to satisfy the pressing claims of these creditors an arrangement was made whereby State of Louisiana Highway bonds of the par value of $15,000,000 were issued to the Pyramid Securities Co., to which company the creditors surrendered their certificates of indebtedness, which, in turn, were transferred to the Louisiana State Highway Commission. The Pyramid Securities Co. then pledged to several state banks the $15,000,000 par value of bonds as collateral for loans totaling $12,-000,000, the proceeds of which it used to pay in cash to the creditors, including Easton, 80 percent of their claims. For the remaining unpaid 20 percent of such claims each creditor received a "Certificate of Participation in Proceeds Of State of Louisiana Highway Bonds, Series F" issued by the Hibernia Bank & Trust Co. as trustee under an agreement dated April 23, 1932, between that bank and the Pyramid Securities Co. Such certificates entitled the bearer, upon certain conditions, to participate proportionately in the net proceeds from the sale of the $15,000,000 par value State of Louisiana Highway bonds after payment therefrom of the $12,000,000 loan with interest. The certificate of participation provided for interest at the rate of 5 percent per annum, payable September 15, 1932, and semiannually thereafter, until the bonds should be sold. For the 20 percent unpaid portion of its original claim against the Louisiana State Highway Commission, Easton received one of the certificates of participation, dated April 25, 1932, for the principal amount of $10,073.32, and in the fall of 1932 the semiannual interest thereon was paid to and received by Easton. The State of Louisiana Highway bonds pledged

as collateral were not sold during 1932. The petitioner, Easton, in 1932 charged off the amount of $10,073.32 as a worthless debt.

The record contains no evidence as to the actual worthlessness of the certificate of participation or the ascertainment that it was worthless during the year 1932. On the contrary, the fact that Easton was paid interest on its certificate in the fall of the year 1932 in which it was issued would indicate that the certificate was not worthless. Section 23 (j) of the Revenue Act of 1932, in providing for a deduction for bad debts, which corresponds to the similar provisions of the earlier acts, requires both an ascertainment of actual worthlessness and a charge-off within the taxable year for which the deduction is sought. Cf. *Paul Pryibil*, 31 B. T. A. 164. Because of petitioners' failure to establish that the debt in controversy was in fact worthless and that petitioners ascertained such fact during the taxable year 1932, the respondent's disallowance of the claimed bad debt deduction must be approved. Cf. *Higginbotham-Bailey-Logan Co.*, 8 B. T. A. 566, 578; *Domhoff & Joyce Co.*, 17 B. T. A. 1015; affd., 50 Fed. (2d) 893.

Reviewed by the Board.

> *Decision will be entered for respondent in both proceedings.*