**PFOH, Plaintiff-Appellee, v. WHITNEY, et al.,
Defendants-Appellants.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 19776.   Decided June 25, 1945.

Harrison & Marshman, Cleveland, for plaintiff-appellee.
Miller & Hornbeck, Cleveland, for defendants-appellants.

**OPINION**

By MORGAN, J.

The plaintiff in his petition alleged that for many years he was a member of the Brotherhood of Railway Trainmen and that on or about July 16, 1941, he received from the defendant, Whitney, the President of the Brotherhood, a notice in writing of his expulsion from the Brotherhood. That the conduct of the defendants in causing charges to be brought against the plaintiff, and in securing an order expelling him from

membership in the Brotherhood, was unlawful in the following respects to-wit:

1. That the plaintiff was charged with political agitation and with supporting Wendell L. Willkie for President, when in fact he had a lawful and constitutional right to support whomsoever he wished.

2. That defendants maliciously, spitefully, and without justification, denied and deprived the plaintiff of his rights of appeal to the Board of Appeals as provided by the constitution and the laws of the Brotherhood.

3. That the defendants maliciously, oppressively and without excuse or justification, and to satisfy their wicked and malicious desire to harm and injure the plaintiff, caused his expulsion from the Brotherhood and deprived him of his property, his vested interest in the Brotherhood, and in its assets and of insurance under the insurance policy issued by the Brotherhood.

The concluding paragraph of the petition states:

"That all of said acts were carried on as the result of an agreement, understanding and conspiracy by and between all of the defendants named herein and numerous other persons associated with or subordinate to the defendants and that all of said acts were performed and carried out by the defendants in a spirit of malice and ill will and with the intent to cause the plaintiff harm."

In his prayer, plaintiff asks for money damages and "for a further sum by way of punitive damages by reason of the malice and ill will actuating the defendants in the premises."

In their joint answer, the defendants admit that the plaintiff on or about July 16, 1941, received from the defendant, Whitney, the notice of expulsion from the Brotherhood; that the plaintiff had a legal and constitutional right to support, vote for and campaign for Wendell L. Willkie for president, but denied that he had any right to support or campaign for Willkie in such a way as would suggest or imply the approval of the defendant Brotherhood.

The answer further states that the plaintiff had violated the constitution and rules of the Brotherhood and that all the processes, procedures, trials and appeals conducted by the defendants with regard to the actions of the plaintiff were in conformity with and in the scope of the constitution of the Brotherhood. The defendants accorded to plaintiff all rights of appeal as provided in the constitution of the Brother-

hood. That the defendant, Whitney, at all times acted in conformity with his rights, power and duties as President of the Brotherhood, and that the defendant Harvey, as assistant to the president, at all times acted in conformity with the constitution of the Brotherhood and on instructions of the defendant, Whitney, as president.

The answer sets forth in detail the provisions of the constitution and rules of the Brotherhood controlling the action taken in expelling the plaintiff.

Plaintiff's reply denied that he violated any obligation to the Brotherhood or any of the provisions of its constitution and alleged that he at no time represented that the Brotherhood was supporting Wendell Willkie.

The case went to trial with the result that the verdict of the jury was in favor of the plaintiff for $6000.00 against all defendants.

The record discloses that at the Second Quadrennial Convention of the Brotherhood held in Cleveland, Ohio, there was introduced and passed, on May 18, 1939, a resolution which, after reciting the services rendered by President Franklin D. Roosevelt to the country, provided as follows:

"RESOLVED, that the Second Quadrennial Convention, Brotherhood of Railway Trainman, urge President Franklin D. Roosevelt to become a candidate for a Third Term as President of the United States."

At the same Second Quadrennial Convention there was also passed the following resolution:

"WHEREAS, this Second Quadrennial Convention of the Brotherhood of Railway Trainmen in recognition of the worthy aims and achievements of the New Deal Administration, has gone on record supporting Franklin D. Roosevelt and as favoring a continuation and elaboration of the social welfare policies of the New Deal * * * *, RESOLVED, that in order to enable the membership of this Brotherhood to participate completely in the great movement to insure a New Deal victory in 1940 the subordinate lodges, the state legislative boards and the state legislative representatives be urged to cooperate in a practical way with progressive organizations which are intended to further New Deal principles * * * * *."

As is well known, in the following year, 1940, Franklin D. Roosevelt became the nominee of the Democratic Party for

President and Wendell L. Willkie the nominee of the Republican Party.

On or about October 30, 1940, defendant Whitney received about 35 letters from different lodges of the Brotherhood of Railway Trainmen and members thereof throughout the country, enclosing a letter purporting to have been signed by the plaintiff favoring the candidacy of Wendell L. Willkie for President, which enclosure, they stated, had been received by them in the mails. These letters from lodges and members of the Brotherhood uniformly expressed disapproval of the circularizing of the lodges and members of the Brotherhood with a letter signed by a member and a former lodge president favoring the candidacy of Willkie. Some of the letters requested President Whitney to take disciplinary action by reason of the violation of the constitution and rules of the organization. This letter was on the letterhead of "Labor's Willkie for President National Committee" with the names of the officers of the committee. The letter was as follows:

"Dear Voter:

We are all very concerned regarding the many important issues to be decided upon Nov. 5 (Election Day). The position of Mr. Wendell L. Willkie in regard to some of the important issues of today, is explained in the enclosures, especially regarding labor, industry, unemployment etc.

If you will carefully study the enclosed literature it should convince you that the election of Wendell L. Willkie will relieve the many undesirable conditions existing under the New Deal Administration. Mr. Willkie has satisfied the inquiries and received the endorsement of Past President E. E. Pfoh of B. of R. T. Lodge No. 132.

Yours truly
(signed) C. W. Vance
C. W. Vance, Vice Chairman
Labor's Willkie for President
National Committee
(signed) E. E. Pfoh
E. E. Pfoh, Past President
B. of R. T. Lodge No. 132."

On October 30, 1940, the defendant Whitney sent the following letter to the secretary of Lodge 132 B. of R. T.:

"October 30, 1940

Mr. William Lambert
57 Norman Avenue
Avon Lake, Ohio.

Dear Sir and Brother:

I am forwarding to you herewith photostat · copy of a circular letter carrying the signature of Brother E. E. Pfoh as past president of B. of R. T. Lodge No. 132, which I am informed has been generally circulated in this territory.

While, of course, a member of the Brotherhood as a citizen is privileged to vote for or support a candidate of his choice for office, he is not privileged to use the name of the Brotherhood or his membership therein in furthering the interests of other than a candidate who has been endorsed for election and in doing so he is in violation of our law and his obligation.

Attention is invited to the provisions of Section 154 of the Constitution as well as the legislative laws of our organization, and you are instructed to see that charges are promptly filed against Brother Pfoh and the constitution enforced against him for the violation of his obligation and our law which is indicated by the enclosed communication, furnishing my office with the information regarding this case required by section 104 to be furnished to the Grand Lodge.

Fraternally yours<br>(signed) A. F. Whitney<br>President."

Section 154 referred to in the said Whitney letter is as follows:

"Any circular emanating from the subordinate lodge or any member thereof, which is intended for general circulation among the members of the Brotherhood shall require the approval of the President of the Brotherhood before being put into circulation * * *. Any member violating this section shall, upon conviction thereof, be expelled."

It is conceded in this case that Pfoh did not submit the Willkie letter to President Whitney so that Whitney's approval of the letter was not secured before it was put in circulation.

On November 10, 1940, William Lambert, secretary, mailed the following letter to Lodge No. 132 B. of R. T.:

"J. M. Ferris, Lodge No. 132
Brotherhood of Railway Trainmen
Dear Sir and Brothers:

I hereby charge Brother Earl E. Pfoh, a member of this lodge, with the violation of his obligation and the law of the

Brotherhood as set forth in Section 154, Constitution of the Brotherhood of Railway Trainmen.

Specification First:

That the said Brother E. E. Pfoh did, on or about the 25th day of October, 1940, sign as past president of J. M. Ferris Lodge No. 132, a circular letter as evidenced by enclosed photostat copy of same, without the approval of the president of the Brotherhood.

Fraternally yours

(signed) William Lambert

Member, Lodge No.132."

The above letter contained the charge against Pfoh in compliance with Sec. 144 of the constitution. It was duly presented to Lodge 132 of the Brotherhood of which Pfoh was a member. A date was set for the trial and Pfoh was duly notified.

In compliance with Sec. 145 of the Constitution the charge was submitted to a committee of five members for investigation. This committee on the. date fixed, met, heard the charges and made their report to the lodge at its next regular meeting. The committee recommended that Pfoh be found 'not guilty' and this action was sustained by the lodge.

Sec. 147 of the constitution has the following provisions as to an appeal by the president:

"Provided, however, that if the committee decides that the charges are not sustained and the report is accepted by the lodge * * * then * * * the president of the Brotherhood * * * may appeal from the action of the lodge to the Board of Directors" in the manner specified.

President Whitney, following Pfoh's acquittal by his lodge, duly appealed the matter to the Board of Directors. The board is made up of nine members, elective officers of the Brotherhood, as follows: The President, Assistant President, General Secretary and Treasurer, Four Senior Vice-Presidents, The National Legislative Representative and the Chairman of the Board of Trustees.

A meeting of the Board of Directors was called to hear the appeal. At this meeting Pfoh and his representative were present.

Sec. 145 of the Constitution provides that the committee of five appointed by the lodge to hear the charges against a member shall "keep full minutes of their proceedings and

evidence which they shall report to the lodge at the next regular meeting together with their decision on the charge."

However, no stenographer was present at the Pfoh hearing before the lodge committee and accordingly the minutes of the proceedings and the evidence taken were not available.

In view of this situation the Board of Directors on January 13, 1941, decided that the case be "remanded to the lodge for a new trial with instructions that a stenographic report of all the evidence by an official court reporter be taken, upon which evidence the lodge will render a decision."

There was a second trial before a lodge committee of five, held on March 12, 1941, and a complete stenographic record was taken. This record was introduced at the trial below and is a part of the bill of exceptions. The five members of the committee voted that the charges were not sustained. On March 26, 1941, the matter was submitted to the entire lodge as required by the constitution of the Brotherhood, and the verdict of acquittal was affirmed. The defendant, Whitney, as President of the Brotherhood filed his appeal from this decision to the Board of Directors as provided in Sec. 147 of the Constitution. The appeal was heard by the Board of Directors on July 15, 1941. The action of the Board is found in a letter of June 15, 1941, signed by G. W. Anderson as secretary of the Board to the defendant Whitney as President of the Brotherhood. It is as follows:

"July 15, 1941.

Mr. A. F. Whitney,
President of B. of R. T.
Office.
Dear Sir and Brother:

Referring to your appeal to the Board of Directors from action of Lodge 132 in finding E. E. Pfoh not guilty of charges preferred against him because of circular issued in connection with the 1940 National Election:

After carefully considering all of the evidence presented in this case, both written and oral, the Board decided (President Whitney and Asst. President Harvey not participating) that the appeal be sustained.

Fraternally yours
(signed) G. W. Anderson,
Secretary, Board of Directors."

Seven members of the Board were present at the meet-

ing on July 15, 1941, including the defendants Whitney and Harvey. It does not appear that Pfoh was present although there is no claim made that he was not properly notified of the time of the hearing. Defendants Whitney and Harvey did not vote or participate in the discussion. The other five members of the Board voted unanimously to reverse the action of Lodge 132 in acquitting Pfoh.

In reversing the decision of the lodge, the board of directors of necessity must have found that Pfoh was guilty of a violation of Sec. 154 of the Constitution. This was the only charge brought against Pfoh and the penalty fixed for such a violation by the Constitution was expulsion. Neither the Board of Directors nor the officers of the Brotherhood had any discretion to reduce this penalty. The record in this case discloses that a member guilty of the violation of Sec. 154 might or would also be guilty of violating Sec. 142 of the constitution which provides:

"Any member guilty of violating any of the duties of membership or any of the principles of the Brotherhood, shall, upon conviction thereof, be reprimanded, suspended or expelled * * * * *. Any member or members sending circulars to any lodge or members of this Brotherhood, or circulating reports liable to cause trouble or injure the Brotherhood, shall be expelled."

Pfoh however, was not charged with a violation of section 142 and the evidence is uncontradicted that if the plaintiff had not been guilty of a violation of Sec. 154 he would not have violated section 142. In reversing Lodge 132 in this matter the Board of Directors of necessity found that Pfoh was guilty of violating section 154.

Accordingly, although the Board of Directors in reversing the decision of Lodge No. 132 in this case and finding Pfoh guilty of a violation of section 154, did not in so many words fix expulsion as the penalty, the penalty of expulsion was fixed by and in the section. Therefore, when the defendant Whitney was formally notified in a letter from Anderson, the secretary, of the Board's action in the matter, Whitney had no discretion or alternative other than to carry out the penalty of expulsion as fixed in section 154. Accordingly, on July 16, 1941, by letter Whitney notified both Lodge No. 132 and Pfoh of his expulsion.

Later on Sept. 7, 1941, Pfoh in a letter to Anderson, secretary and treasurer of the Brotherhood, attempted to appeal the case to the Board of Appeals of the Brotherhood at

their next meeting. To this letter Mr. Anderson on Sept. 11, 1941, relied to Mr. Pfoh as follows:

"I would call your attention to the provisions of lines 54 and 55 of section 147 of the constitution and general rules of the Brotherhood, setting forth that 'the decision of the Board of Directors on the appeal shall be final.' You are therefore advised that your appeal cannot be recognized and your case has been finally closed out under our laws.

Very truly yours

G. W. Anderson

General secretary & treasurer."

There can be no doubt that the general secretary correctly stated and interpreted the constitution in denying Pfoh the right to appeal the action of the Board of Directors to the Board of Appeals of the Brotherhood. Later Pfoh filed this action to recover the damages caused him by his wrongful expulsion from the Brotherhood.

That in the case of wrongful expulsion of a member from such an organization as the defendant Brotherhood, the expelled member may sue for damages without first prosecuting his remedy by appeal within the lodge, is well established.

Lahiff v Society, 76 Conn. 648.

**Independent Order v Wilks, 98 Miss. 179.**

Thompson v Locomotive Engineers, 41 Tex. Civ. Rep. 176.

**Mystic Order ex rel v Fritter, 61 Oh St 628.**

31 Amer. Juris. 865.

This brings us face to face with the question of law: When and under what conditions will courts of law refuse to follow and to be bound by the findings and decisions of the highest tribunals of unincorporated associations such as the Brotherhood of Railway Trainmen?

To be more specific; when and under what conditions will civil courts either restore to membership an expelled member of an association or award him damages for wrongful expulsion?

The question has been considered and decided by the highest courts of a number of states in cases in which the relief sought was either restoration to membership or damages for wrongful expulsion. In all of these cases the right of our civil courts to interfere with the decisions of the proper tribunals of unincorporated associations as to rights of membership is strictly limited.

In the case of Local No. 7 v Bowen, 278 Fed. 271, the court at page 274 uses the following language which has been in-

corporated into the text of Oakes on Original Labor and Industrial Complaints, page 65:

"The field of judicial interference with the actions of voluntary associations as to controversies between their members, as to the method and manner in which the rights to membership may be maintained and continued, is and should be a very narrow one and its boundaries should be maintained with the utmost care so that only upon the clearest kind of showing either that the constitution and rules are violated by the decision of the tribunal set up by them, or that the remedies provided by the parties in their agreements, for an appeal from or the review of decisions of their own constituted tribunals, are non-existent or unreasonable, should the courts permit their jurisdictions to be invoked."

In Froelich v Benefit Association, 93 Mo. App. 383, the court (page 389) quoted with approval from the case of Conley v Masonic Mutual Benefit Association, 9 L. R. A. 428 in which the supreme court of Connecticut said:

"The decisions of any kind of a voluntary society or association in admitting members, suspending or expelling them, are of a quasi-judicial character. In such cases the courts never interfere except to ascertain whether or not proceedings were pursuant to the rules and laws of the society and whether or not the proceedings were in good faith and whether or not there was anything in the proceedings in violation of the laws of the land."

No claim was made by the plaintiff that section 154 of the constitution of the Brotherhood was in violation of the laws of the land, or that it was not a valid part of the constitution.

People ex rel Holmstrom v Union, 164 App. Division Rep. 267 (N Y). This was an action in mandamus by an expelled member to compel his reinstatement in a union. Held: (3rd parag. of syllabus)

"The court in reviewing proceedings to discipline a member of a voluntary association or membership corporation, will search the record to see whether the proceedings have been in accordance with the constitution and by-laws of the organization, whether the charges are substantiated and whether the member has had fair notice and opportunity

to be heard. If so, the court will not substitute its judgment for that of the organization."

To the same effect is the New York case of Osmun v President, Brotherhood of Locomotive Engineers, 56 App. Div. 393. Zelliff v K. of P. Lodge, 53 N. J. Laws 536. This was an action in mandamus to restore plaintiff's membership in the lodge after expulsion. The court held:

"In regard to matters of discipline, the courts will not interfere against the decision of the club professing to act under its rules unless it can be shown either that the rules were contrary to natural justice or that what has been done is contrary to the rules or that there has been mala fides, or malice, in arriving at the decision or refusal to give the member a hearing."

Richards v Morrison, 229 Mass. 458. Action in damages against the governing committee of a social organization for wrongful expulsion from membership. The court (Chief Justice Rugg) said at page 460:

"The plaintiff, by becoming a member of the association, agreed to be bound by its rules and subject to its discipline. As one of the incidents of membership, he consented to accept liability to expulsion, ordered in accordance with its regulations. When the action of the association or of its officers is challenged in respect to the exercise of the power of expulsion, the court does not sit in review upon the wisdom or expediency of their conduct. The decision of the organization and its officers acting in good faith in accordance with the rules on that subject is the final tribunal."

The above quotation is copied with approval in the case of **Boblitt et al v Railroad Company, 73 Oh Ap 339** at page **346.**

Railway Co. v Thompson, 102 Tex. 89. This was an action for damages for procuring the wrongful expulsion of plaintiff from the Brotherhood of Locomotive Engineers. The court said (page 98):

"If the members of Division 201 of the Brotherhood of Locomotive Engineers, in good faith fairly and honestly passed upon the testimony submitted to them and found Thompson guilty of violating his obligation, or the constitution and

laws of the order, then their action would be final and conclusive of the matter and the plaintiff could not recover in this case because of his expulsion from that order ⁴ * * * *."

Simpson v Engineers, 83 W. Va. 355. This was an action for damages for wrongful expulsion from the Brotherhood of Locomotive Engineers. The court said on page 337:

"The propositions on which these observations stand are obvious corollaries to which the courts have yielded particularly unanimous assent. The expulsion of a member of a voluntary association, whether incorporated or not, after notice, an opportunity to be heard and a trial fairly conducted, agreeably to the laws of the association, is conclusive upon the civil courts."

38 American Juris. 500:

"The expulsion or suspension of a member by a mutual benefit society, though carrying with it the forfeiture of insurance rights, if for a cause within the jurisdiction of the tribunal of the association by which it was pronounced, and after notice and opportunity to be heard, and the result of a trial fairly conducted in accordance with the laws of the association, is conclusive upon the merits and binding upon the civil courts, whether the action or proceeding in the civil court is for the restoration to membership or damages for expulsion * * * *."

Among other authorities to the same effect are:

Society etc v Commonwealth ex rel Meyer, 52 Penna St. Rep. 125.

Love v Brotherhood of Locomotive Engineers, 139 Ark. 375.

Benevolent Assoc. v Benson, 76 Tex. 552.

Pratt v Amalgamated Assoc., 50 Utah 472.

It is conceded in this case that all the proceedings—the preferring of charges, the trial before the committee of Lodge 132, the action of the lodge, the appeal to the board of directors and the hearing before the board—were conducted in strict compliance with the constitution and rules of the Brotherhood.

The plaintiff was given full opportunity to be heard in all stages of the proceeding. He was present at the hearing before the committee, at the meetings of Lodge 132, and at the first hearing before the board of directors. While it does not appear that he was present at the second hearing before the board, his failure to be present was of his own choice.

The next question is this: To what extent does the record impugn the good faith of the board of directors, or rather of the five members of the board who voted to reverse the action taken by Lodge No. 132. Here we encounter a surprising fact. We have examined the record and we find in it not one syllable discrediting the board of directors or impugning the good faith of a single member, who found the plaintiff guilty, and there is no evidence in the record that the said five members of the board or any one of them entered into a conspiracy or was actuated by malice in casting his vote.

The members of the Board who voted to find Pfoh guilty were not appointed by Whitney but were duly elected by the membership. It is true that both the defendants, Whitney and Harvey were present at the hearings before the Board. As members of the Board they had the right to be present but neither participated in the discusion nor cast a vote. There is nothing in the record tending to show that Whitney or Harvey controlled the Board of Directors or brought any improper influence to bear on the action of the board.

Five special interrogatories were submitted to the jury at the trial. Interrogatories Nos. 4 and 5 dealt with the circulating of the Willkie letter signed by plaintiff. Interrogatory No. 4 was as follows:

"Did the plaintiff sign the Willkie leaflet which is in evidence with the knowledge that it would be and with the intention that it should be circulated among the Brotherhood officers or lodges or members?"

The jury with the exception of one member, voted "no." Interrogatory No. 5 was as follows:

"Did the plaintiff have any part in the distribution or circulation of the Willkie leaflet which is in evidence?"
The jury voted "no."

When the jury answered that in its opinion the plaintiff did not sign the Willkie letter with the knowledge that it would be and with the intent that it should be circulated among the officers, lodges or members of the Brotherhood, the jury indicated that it believed that the plaintiff was not guilty of a violation of section 154 of the constitution. The question then becomes: What importance attaches to the answers by the jury of interrogatories 4 and 5?

As already shown, the cases and authorities uniformly

hold that neither court nor jury in this class of cases has the right to substitute its judgment for that of the Board of Directors of the Brotherhood. By interrogatories 4 and 5 the jury was asked to do that very thing and therefore the submission of these interrogatories was clearly erroneous and the answers of the jury have no relevancy in the case.

38 Amer. Juris. 500:

"A member who has been expelled cannot by resorting to the courts by way of proceedings to compel his restoration to membership or otherwise, relitigate the questions of fact which have regularly been determined against him by the association or by some committee or tribunal therein authorized by its constitution or by-laws to investigate and determine the question. * *"

The only proper interrogatories which might have been submitted to the jury on this line are such as these: Was the charge against Pfoh filed and proceeded with according to the constitution and rules of the Brotherhood? Was the plaintiff given a fair opportunity to be heard and to present his case?

Some jurisdictions above referred to would stop there, holding that the action of the board of directors in this case would not be subject to collateral attack. In other jurisdictions the following questions would be deemed proper jury questions: In finding the plaintiff guilty of the offense charged, did the board of directors act in good faith or in a capricious and arbitrary manner? That is, did the board reach its decision honestly or was the evidence so one-sided in favor of Pfoh that the action of the board is inconsistent with any claim that it acted judicially?

These questions and questions of like tenor were not submitted to the jury in this case.

The good faith and honesty of the board of directors are to be determined by their action on the evidence presented to them. The board heard the case on the same evidence that had been presented to the lodge committee. It consisted of some 65 typewritten pages which are to be found in the Bill of Exceptions. It consisted for the most part of the Willkie letters signed by Pfoh with enclosures, which were received at the office of the Grand Lodge in Cleveland from subordinate lodges and members of the Brotherhood together with Pfoh's denial that he had anything to do with circulating the letters or that he had any knowledge of the intention to circulate them to members of the Brotherhood.

A considerable part of the evidence presented to the trial committee of Lodge No. 132 was concerned with the question whether the words "E. E. Pfoh, Past President B. of R. T. Lodge No. 132" which appears under Pfoh's signature on the Willkie letter circulated among the lodges and members of the Brotherhood, were already on the letter when Pfoh signed it or were added afterwards and without his knowledge and consent. Pfoh testified that the above words appearing under his signature were added after he signed the letter and without his knowledge or consent.

We do not ascribe the same importance to this question of fact as did the trial court in this case. It is not denied that the concluding paragraph of the letter stated that "Mr. Willkie has satisfied the inquires and received the endorsement of Past President E. E. Pfoh of B. of R. T. Lodge No. 132." There is no claim that this paragraph was added after plaintiff signed the letter. The designation appearing under Pfoh's signature as the letter was mailed does not contain any information not found in the body of the letter. So that whether the designation appeared on the letter when signed by Pfoh or was added later is of slight importance.

The evidence presented to the trial committee of Lodge No. 132 and to the Board of Directors constitutes only a small part of the evidence submitted to the jury at the trial of the case. Most of the additional evidence was introduced to prove malice and a conspiracy on the part of the defendants, although as stated, none of this evidence related to or cast discredit on any of the five members of the board of directors whose action directly resulted in Pfoh's expulsion from the Brotherhood.

Pfoh's explanation at both trials of his signing the Willkie letter was that he understood that the letter was to be used at a Willkie meeting to be held somewhere on Cedar Avenue in Cleveland. However, it is difficult to give this statement credence in view of the fact that the letter is addressed to "Dear Voter" and that the second paragraph of the letter reads:

"The position of Mr. Wendell L. Willkie in regard to some of the important issues of today is explained in the enclosures especially regarding labor, industry, unemployment * * * *."

Addressing the letter to "Dear Voter" and the reference to "enclosures" to accompany the letter, show pretty clearly that this letter was prepared and signed to be circulated and

that its use was not to be limited to a single political meeting on Cedar Avenue.

It is interesting to note the view expressed by the trial judge as to the evidence in the case. Although he did not grant a motion for new trial, during the hearing of the motion he expressed quite frankly his own opinion of the evidence. Judge Corlett's statements are found in the bill of exceptions and are as follows:

"Had this court been trying this case as a jury, the court would have had some difficulty believing that Pfoh, the plaintiff, was so naive or innocent and unsuspecting as to even sign this letter—not knowing or believing that it was to be circulated among the members—as past president of this local. He was a member of the organization for some time and active in the membership of the organization and in the conventions; perfectly familiar with the rules and regulations and constitution; should have been and no doubt was."

The court further said:

"I am telling you frankly, in the opinion of the court from this bench, if I was trying this case as a jury, Pfoh never would have got a verdict at the hands of this court."

That the trial court disagreed with the verdict of the jury does not necessarily mean that the judge was right and the jury wrong. However, no one will claim that the trial judge gave an arbitrary or dishonest opinion or showed bad faith in reaching a different conclusion from the jury. By what right therefore can anyone fairly claim that the board of directors of the Brotherhood which came to the same conclusion as the trial judge, was guilty of bad faith and dishonesty in rendering its decision? Especially when, as already stated, there is not a particle of evidence in the record connecting any one of the five directors with any conspiracy or tending to prove that they acted maliciously.

There is another striking bit of evidence which shows that the good faith and credit of the board of directors in its hearing and decision on the charges against Pfoh cannot be impugned. Plaintiff's counsel repeatedly in the record referred to the Brotherhood Convention of 1939. He claimed that there was a "row of unparalleled bitterness' between two factions at the Convention. One faction was led by Whitney and the other by Anderson. Smith, the candidate of the Anderson faction for President received 393 votes as against 546 votes

434

for Whitney. Pfoh was a member of the Anderson faction and supported Smith for president, the inference being that he thereby incurred Whitney's ill will.

The surprising fact is that this same Anderson by virtue of his petition as secretary and treasurer of the Brotherhood, was a member of the board of directors and was present at both of the Pfoh hearings before the board. Anderson was one of the five directors who voted to reverse the decision of the lodge and thereby to find Pfoh guilty of the charge against him. Certainly Anderson had no malice or ill will directed to his faithful follower, Pfoh.

Also, in support of the motion for a new trial, the defendants introduced in evidence a copy of a letter dated November 1, 1940 (written less than a week before the election) addressed to Wendell L. Willkie at his New York address and signed by the plaintiff Pfoh. This letter was not offered at the trial so that we do not rely on it in reaching a conclusion. However, it is interesting to find our conclusion confirmed by this letter. The first paragraph of the letter is as follows:

"Please find enclosed a copy of letter that has been generally circulated among railroad employees in behalf of your candidacy."

The enclosed "copy of letter" was the Willkie letter signed by Pfoh. The fact that this letter of November 1, 1940, was sent by plaintiff to Wendell L. Willkie was not denied by him on the hearing for a new trial.

Most of plaintiff's evidence in this case was offered in proof of the allegation that the defendants acted maliciously and in furtherance of a conspiracy. This evidence related almost exclusively to the acts of Whitney and Harvey.

The plaintiff proved beyond a doubt that Whitney and Harvey initiated the proceedings to expel Pfoh and prosecuted the charge against him. Whitney and Harvey admitted so much and found the authority for their actions in section 9 of the constitution as to the duties of the president which provided that "the president shall have power, or deputize another officer, to conduct the trial of any member when in his judgment it is proper to do so and may secure and present evidence for the purpose of prosecuting members accused of violating any of the rules or principles of the Brotherhood."

Evidence that Whitney and Harvey conspired together and were actuated by malice in initiating and prosecuting the charge made against the plaintiff, furnishes no proof in

the absence of other evidence that the five directors in voting to reverse the decision of Lodge No. 132 were a part of the conspiracy or were actuated by malice. There is no evidence in the record that any one of the five directors had anything to do with filing or prosecuting the charge against Pfoh or that they had any feeling of spite or ill will toward him.

The gravamen of the charge in this case is the wrongful expulsion of Pfoh from membership in the Brotherhood and in the absence of proof that the five voting directors acted other than judicially there is a complete failure of proof that plaintiff was wrongfully expelled.

There is also a complete failure of proof of the allegations that the defendant, The Brotherhood of Railway Trainmen, acted maliciously or in furtherance of a conspiracy.

The Brotherhood of Railway Trainmen, in the expulsion of Pfoh, was represented by the Board of Directors. Such a charge against the Brotherhood could be sustained only by proof that the Board of Directors was guilty of bad faith, and there is no such evidence in the record.

The charge against the plaintiff was not that he supported Willkie for President. That the plaintiff had, as alleged in the petition, "a lawful and constitutional right to support whomsoever he wished" for President is conceded by the defendants.

In Whitney's letter of October 30, 1940, to the secretary of Lodge No. 132, instructing him "to see that charges are promptly filed" against the plaintiff, Whitney stated that "a member of the Brotherhood is privileged to vote for or support a candidate of his choice for office" and there is nothing in the record to indicate that the defendants at any time took any other position.

The charge against Pfoh which is contained in the letter to the Secretary of Lodge No. 132, dated November 10, 1940, was "the violation of the obligation and the law of the Brotherhood as set forth in Sec. 154, Constitution of the Brotherhood of Railroad Trainmen." This was equivalent to a charge that the Willkie circular emanated from member Pfoh and that it was "intended for general circulation among the members of the Brotherhood" without having first secured the approval of the President of the Brotherhood before being put into circulation as required by Sec. 154 of the Constitution.

It is conceivable that Pfoh might have taken the position that the circular letter addressed to "Dear Voter" was intended for general circulation and the fact that among others the circular was addressed and delivered to some members of the

Brotherhood would not furnish proof that the circular was "intended for general circulation among the members of the Brotherhood" within the meaning of Sec. 154. Plaintiff however at the trial did not take this position. He offered no evidence that the circular was intended for general circulation. He produced no proof as to how or to whom the circular was distributed.

The record discloses that the circular letter was addressed and delivered to lodges and members of the Brotherhood in different parts of the country but the record is silent as to whether any persons not members of the Brotherhood received any of the letters.

Plaintiff did not attack the validity of Sec. 154 of the Constitution. His position is that when he signed the circular he had no knowledge that it would be and had no intention that it should be circulated among the Brotherhood Lodges or members. By taking this position plaintiff, by clear implication, concedes that if he had had such knowledge or such intention he would have been guilty of violating the Constitution of the Brotherhood.

The plaintiff took the position that he signed the circular letter believing that the only use to be made of it was at a single political meeting to be held in Cleveland. The five members of the Board of Directors by sustaining the appeal clearly indicated that they did not believe this statement of plaintiff.

In view of all the circumstances in this case we hold that in coming to this conclusion the Board did not act arbitrarily or in bad faith.

The charge of the court in this case evidences careful and studious preparation. However, a part of it calls for comment. Before argument the court charged:

"The plaintiff in this action charges the defendants with malice, and I say to you that a malicious act is a wrongful act intentionally done, without cause or excuse, and I charge you that an act in itself lawful is not converted by a malicious motive into an unlawful act, so as to make the doer liable to a civil action."

Judge Pitney in the case of Brennan v United Hatters, 73 N. J. Laws, 729, at page 744, defines "malice" in almost the same words:

"Malice in the law means nothing more than the intentional doing of a wrongful act without justification."

"Malice" in this sense is sometimes referred to as "malice in law" and it is not necessary for the plaintiff to make his case to prove that the intentional wrongful act when done without justification was motivated by express malice, that is, spite, ill will, malevolence or hatred.

The plaintiff in his petition used the words "malice" and "maliciously" in the sense of express malice. The petition alleges that the defendants "to satisfy their wicked and malicious desire to harm and to injure the plaintiff, caused him to be expelled from the defendant Brotherhood * * * *."

In his general charge, the court charged the jury:

"It is the law and the court so charges you, that you will apply the law in this case that if these proceedings under the constitution and laws of the Brotherhood of Railway Trainmen were free from malice and conspiracy, then neither the court nor the jury has any right to interfere with the result of these proceedings."

It is evidence that the court in the above part of his charge was using the word "malice" in the sense of express malice as defined above. Ambiguity and confusion have crept into the law by the use of the words "malice" and "maliciously" in these two different meanings.

In an article in 11 Harvard Law Review, page 461, the learned author stated:

"The great objection to the present state of the law is that the term 'malice' is used in a loose and vague sense, being confused with fraud, misrepresentation and oppression. To say that malice is an unlawful purpose to cause damage and loss without right or justifiable cause, is to tell us nothing that is specific of malice, for these elements belong to every intentional tort and it is desirable to define malice as a tort sui generis. As such malice ought to mean in law what it means in fact, the intentional infliction of damage through personal ill will or spite, for purposes of revenge, or for illegitimate and corrupt personal ends.

It is, however, clear from the decided cases that there is no absolute or perfect right to be protected against malice in this sense. It is not unlawful to use one's property to the injury of a neighbor, however malicious the use, and however clear the malice."

438

If the acts of defendants in this case were not otherwise actionable, they would not become so by proof that they were the result of express malice. The statement in the general charge to the contrary is in our view erroneous. The law was stated correctly by the court in the charge before argument that "an act in itself lawful is not converted by a malicious motive into an unlawful act so as to make the doer liable to a civil action." Acts of the defendants were actionable on proof that they constituted the intentional doing of a wrongful act without justification. They were actionable without proof of express malice and if the acts were not otherwise actionable they did not become so by proof of express malice.

Evidence of the existence of express malice, however, may be admissible in cases of this kind to sustain plaintiff's claim to recover punitive or exemplary damages.

Similar confusion exists also in the use of the word "conspiracy" in this case.

That it had some special significance in the mind of the trial judge is shown by the fact that he charged the jury that if the proceedings against Pfoh were "free from malice and conspiracy" the jury would "have no right to interfere with the result of these proceedings."

There is a recognized sense in which a "conspiracy" is a separate tort. Such is the case when an act lawful in itself becomes unlawful if done in concert by a number of persons. This is well stated in 11 Harvard Law Review, page 457, as follows:

"That an act lawful if done by one should become unlawful if done by a number of persons, involves no contradictions in itself, if the act, through being done by many in concert and cooperation, assumes a new and different character. The withdrawal of patronage, the refusal to entertain social and business relations, the discrimination between different persons in making contracts of employment or otherwise, advice, recommendations, encouragement, or warnings addressed to other persons—all these acts are expressions of individual liberty and are lawful because without them our social and economic relations would be subjected to intolerable and arbitrary restraints. But let the same acts be done by a large number of persons in accordance with preconcerted resolutions and in organized cooperation—and the withdrawal of relations means social isolation, discrimination is turned into persecution, the freedom of private relations into a violation of privacy, the liberty of contract into a

dangerous and oppressive use of economic power. In these cases combination may make the act unlawful not because it is malicious, but because it affects and changes the character of the act."

For an instance of "conspiracy" as the foundation of a tort, see 4 Restatement of the Law of Torts, Sec. 765 at page 42.

In 11 Harvard Law Review, page 461, the learned writer states:

"Not every technical conspiracy, however, amounts to oppression, or presents the features which radically alter the nature of the individual act and there is no reason why a malicious act by two or three should be treated differently from a malicious act done by one."

This distinction is also well brought out in the case of Sorrell v Smith, decided by the House of Lords and reported in 1933 Law Times Reports, page 370. Lord Dunedin, one of the Judges there, said:

"Passing therefore to the case of concerted action, the first and obvious observation is that if a combination of persons do what if done by one would be a tort, an averment of conspiracy so far as founding a civil action is mere surplusage. But when there is nothing done which per se would be a tort, then one is at once faced by the consideration that a particular thing done, not in itself a tort, may, if done by an individual, be supportable though unpleasant, but may if done by many in concert, become insupportable and create a real injury. This truism has been recognized by many learned judges."

The evidence supporting a conspiracy in this case is substantially that Whitney initiated the proceedings and that Harvey at Whitney's request, prosecuted the charge before the lodge committee and the lodge.

It seems clear to us that the character of the proceedings against Pfoh was not affected by the fact that Whitney sent Harvey to prosecute the charge against Pfoh before the lodge and the lodge committee, instead of doing it himself.

Plaintiff's case against Whitney would have been just as strong, or just as weak, if Whitney had done all the work himself as it was against Whitney and Harvey by reason of their joint participation.

**The action in this case,** therefore, is not founded on a

440

conspiracy, and in the language of Lord Dunedin in Sorrell v Smith, supra, the use of the term "conspiracy" in this case really "is mere surplusage."

It is our opinion that the court under the established facts in this case erred in charging the jury that the acts of the defendant otherwise not actionable would become actionable if done in furtherance of a conspiracy.

It would be highly desirable if the definition of the term "conspiracy" as the foundation of the action, could be limited to the cases where, although a certain action taken by an individual would not be actionable, the same action when taken by a concert of persons becomes actionable.

Inasmuch as the plaintiff, Pfoh, was given notice of the proceedings against him; as he had a fair opportunity to be present at all the hearings; as the proceedings were conducted in all respects in accord with the constitution and rules of the Brotherhood; and, as there is a failure of proof that the Board of Directors which decided against the plaintiff acted arbitrarily or in bad faith, there was no question in this case to be submitted to the jury.

Therefore, the judgment in this case is reversed and final judgment is entered for the defendants.   Exceptions.

SKEEL, P. J., & LIEGHLEY, J., concur.