[Civ. No. 24913. Second Dist., Div. Two. Nov. 14, 1961.]

CECIL C. MITCHELL et al., Appellants, v. INTERNA-
TIONAL ASSOCIATION OF MACHINISTS et al., Re-
spondents.

Hill, Farrer & Burrill, William McD. Miller and Edwin H. Franzen for Appellants.

A. L. Wirin and Fred Okrand as Amici Curiae on behalf of Appellants.

Rose, Klein & Marias, Parker, Stanbury, Reese & McGee, Parker, Stanbury, McGee, Peckham & Garrett and Raymond G. Stanbury for Respondents.

Bodle & Fogel, George E. Bodle, Daniel Fogel, Stephen Reinhardt, Robert A. Smith and Charles P. Scully as Amici Curiae on behalf of Respondents.

FOX, P. J.—This appeal is from a judgment denying a petition for a writ of mandate. Petitioners seek reinstatement in respondent union, having been expelled for "conduct unbecoming a member." The conduct involved is their "peaceable, open, public, active, and vigorous campaign and support" for Proposition 18, the "right-to-work" law, in contravention of the expressed official policy of the union. (Respondents will be referred to in the singular.)

Petitioner Mitchell was a member of respondent from 1942 to July 8, 1959, the date of his expulsion. Petitioner Mulgrew was a member from 1953 until his expulsion on July 8, 1959. Both petitioners have been continuously employed by the California Division of Lockheed Aircraft from 1942 and 1953 respectively to the present time. Pursuant to an agreement between respondent union and Lockheed, the former is the exclusive bargaining representative of the company's employees in the bargaining unit described therein. Petitioners are

within that bargaining unit. Neither lost his job as a result of the expulsion. The trial court found that the expulsion has not interfered with or threatened interference with petitioners' employment, nor is their opportunity for continued employment with Lockheed uncertain as a result of their expulsion. Lockheed is engaged in interstate commerce and the Taft-Hartley Act applies to it.

Proposition 18 was an initiative measure placed on the 1958 ballot for the general election held in California on November 4. It sought to alter the state Constitution so that both closed shops and union shops would be prohibited in this state. The proposition was defeated by a majority of the voters. The trial court found that respondent was reasonable and justified in regarding the effect of the initiative measure as a serious threat to its best interests, strength, welfare, and existence.[1]

It was further found that petitioners, as individual citizens and "as union members" supported Proposition 18 in the manner stated above by, among other things, issuing releases to the press, distributing handbills, and making speeches on television and before groups in various parts of the State of California. It was not found that they purported to represent their union. They conducted their campaign although they were aware of the union's opposition to the measure and the union's recommendation that its members oppose adoption in every possible legal way. [2]

Petitioners were charged with conduct unbecoming a member of the union and tried on January 13, 1959. They were found guilty as charged. Petitioners waived in open court any claims relating to the regularity of the internal union trial or appeal procedure. The trial court affirmed the union's determination that petitioners' acts constituted conduct unbecoming a member and concluded as a matter of law that the expulsions were justified and not in contravention of public policy or petitioners' constitutional rights.

---

[1]Support for this conclusion may be found in the opinion of Justice Shenk in *DeMille* v. *American Fed. of Radio Artists*, 31 Cal.2d 139, 145-146 [187 P.2d 769, 175 A.L.R. 382].

[2]Although respondent asserts in its briefs that petitioners publicly ridiculed and criticized their union, and further hints that they purported to represent their union in the course of their campaign, it does not appear that they were so charged, and the trial court did not so find. Any attempt to justify the expulsions must be founded solely upon petitioners' public campaign as "individual citizens and as union members." (Finding of fact No. IX, C.T. p. 172.)

Once again a court is asked to choose between rights which conflict. On the one hand there is a voluntary, private organization that insists it has the right to determine its membership, which includes the right to expel members whom it considers obnoxious so long as the union constitution and by-laws are complied with. On the other hand there is the individual member, insisting that he has the right to express himself on political matters as he will, without interference from his group. Viewing this conflict from a first row seat is the community, certainly not without interest in the outcome of the dispute.

 It would seem proper to begin by dispelling two troublesome illusions. The first is that unions are purely voluntary organizations like Republicans, Democrats, Elks, and church groups. A modern labor union, both in structure and in function, bears little resemblance to other voluntary associations. (Summers, *Legal Limitations on Union Discipline*, 64 Harv.L.Rev. 1049, 1051.) "It is this omnipotent analogy that leads the courts astray." (Williams, *The Political Liberties of Labor Union Members*, 32 Tex. L. Rev. 826, 829.) Unions can be distinguished from other voluntary organizations in many respects. Most importantly, a large part of their power and authority is derived from government which makes it exclusive bargaining agent. Further, they are not primarily social groups which require homogeneous views in order to retain smooth functioning. They are large, heterogeneous groups, whose members may agree on one thing only—they want improved working conditions and greater economic benefits. The union's power, when considered together with its source, imposes upon it reciprocal responsibilities toward its membership and the public generally that other voluntary organizations do not bear. (*James v. Marinship Corp.*, 25 Cal.2d 721, 731 [155 P.2d 329, 160 A.L.R. 900] ; *Chavez v. Sargent*, 52 Cal.2d 162 [339 P.2d 801] ; *Betts v. Easley*, 161 Kan. 459 [169 P.2d 831, 166 A.L.R. 342].)

 Secondly, it cannot be assumed that the only value in membership is job retention. Even though a member may keep his job when expelled, his expulsion causes him to suffer a detriment the apprehension of which would no doubt have a coercive effect on the membership. First of all, it is not clear what his rights would be if he quit his job to seek another, at least in intrastate commerce. Also, he has a financial

stake in the strike fund, perhaps a pension fund, and other funds to which he has contributed. Further, he is denied the right to participate in his union "government." Although the union is required by law to represent him impartially (*Steele* v. *Louisville & N. R. Co.*, 323 U.S. 192 [65 S.Ct. 226, 89 L.Ed. 173]), he has no voice in how that representation is to be conducted. In addition, there are frequently social ramifications for a nonmember working among members that cannot be overlooked. All this is solely for the purpose of demonstrating that there *is* a real conflict which cannot be dismissed by the assertion that since a member is assured by federal legislation that loss of membership for a reason other than nonpayment of dues does not mean loss of job, he is free to do as he wishes.

A review of the case law in and around this area will serve to orient the reader. There are two important cases dealing with the power of the union to use dues or assessments for political purposes opposed by individual contributing members. The most recent is *International Assn. of Machinists* v. *Street*, 367 U.S. 740 [81 S.Ct. 1784, 6 L.Ed.2d 1141]. This was an action to enjoin enforcement of a union shop agreement entered into pursuant to the permissive language of section 2, eleventh, of the Railway Labor Act, which also permits expulsion for nonpayment of dues. Certain members contended that the union could not use, over their objections, their dues to support political candidates and doctrines which they opposed. The Supreme Court held in favor of the members, interpreting the Railway Labor Act as prohibiting the use of members' contributions for the support of political causes which they oppose, when they make their objection known. The history of the Railway Labor Act was reviewed, and at page 764 the opinion concludes that the purpose of section 2, eleventh was merely to permit coercion of all employees to share the expenses incurred by the union in the pursuit of its *economic* objectives. Therefore the use of funds for political purposes falls outside of the very reasons underlying adoption of the legislation. Mr. Justice Frankfurter wrote a dissenting opinion. Distinguishing that case from ours, he conceded that "a totally different problem than the one before the Court would be presented by provisions of union constitutions which in fact prohibited members from sponsoring views which the union opposed, . . ." (Pp. 805-806.) The other case is *DeMille* v. *American Fed. of Radio Artists*, 31 Cal.2d 139 [187 P.2d 769, 175 A.L.R. 382]. It

was an action to restrain a union from suspending a member for failure to pay one dollar assessed for the purpose of opposing a "right to work" law. The court held for defendants on the ground that (1) the union might reasonably consider the proposition inimical to its interests; (2) the objective of defeating it at the polls is a proper purpose of the organization; (3) and funds might lawfully be expended for that purpose. (Pp. 145-146.) It was further found that the assessment was levied in accordance with the constitution and by-laws of the union. It was pointed out by the court that it was *not contended* by the plaintiff that he was prevented in any way from publicly or privately expressing his personal views on the subject, and it was also made clear that the defendants did *not* declare that acts or expressions of individual members favorable to the proposition would constitute grounds for charges of disloyalty. (Pp. 147-148.) Although the opinion makes this distinction in answer to a constitutional argument, it is clear that the union action involved herein was not involved in the *DeMille* case, and furthermore, that the policy question here presented—the extent to which a union should be permitted, in its own interest, to use the threat of expulsion to inhibit the expression of political views by its members[3]— was also not involved in that case. These two cases are examined here merely to demonstrate not only that they are not controlling, but that they expressly leave open the question before us.

Other groups of cases involving the question of the extent of the limitation on personal rights imposed by union membership have been fairly well categorized by the writers. At one extreme there are the "treason" cases in which an individual's acts are patently antagonistic to the continued existence of the union as a collective bargaining agent. Company spies and dual unionists are two examples. (See *Summers, supra,* at p. 1059 et seq. See also *Davis* v. *International Alliance etc. Employees,* 60 Cal.App.2d 713 [141 P.2d 486].) Similar cases are those in which members impair adherence to the collective bargaining agreement by violating work rules, working below scale, and engaging in wildcat strikes. (See *Williams, supra,* at p. 831.) The courts lose no time in such cases in upholding union discipline. At the other extreme are cases in which the courts frustrated union attempts to inter-

---

[3]Or, conversely, the extent to which a member may express political views contrary to the union position and still insist upon membership.

fere with specific citizenship obligations. The Barbers were enjoined from expelling a member for enforcing Sunday laws against a fellow member (*Manning* v. *Klein,* 1 Pa. Super. 210). The Plumbers were prevented from expelling a member who, as a public official, refused to appoint another member as a plumbing inspector (*Schneider* v. *Local Union No. 60,* 116 La. 270 [40 So. 700, 114 Am.Ct.Rep. 549, 7 Ann. Cas. 868, 5 L.R.A. N.S. 891]). Another union was compelled to reinstate a member who testified before the Interstate Commerce Commission against safety devices sought by the union (*Abdon* v. *Wallace,* 95 Ind.App. 604 [165 N.E. 68]). Other unions have been ordered to reinstate members who testified against the union in court (*Angrisani* v. *Stearn,* 167 Misc. 731 [3 N.Y.S.2d 701]; *Thompson* v. *Grand International Brotherhood of L.E.,* 41 Tex.Civ.App. 176 [91 S.W. 834]).

Somewhere between these two extremes lies the small group of cases involving political activity by members, obligatory only in the moral sense, which the union as a whole opposes. *Spayd* v. *Ringing Rock Lodge No. 665,* 270 Pa. 67 [113 A. 70, 14 A.L.R. 1443], involved an action by a member of the union to compel reinstatement following expulsion for violation of a rule prohibiting any member from using his influence to defeat any action taken by union officials concerned with legislation. Plaintiff was expelled because he signed a petition asking the Legislature to reconsider its adoption of the "full crew law." Using every legal theory available under the circumstances, the court held that the union's action violated plaintiff's property rights, the Constitution, and public policy. Concluding, the opinion states, at page 73 [113 A.], "The right here involved, and the voting franchise, are the only means by which peaceful changes in our laws and institutions may be sought or brought about, and they cannot, with safety to the state, or the whole body of the people, be gathered into the hands of the few for any purpose whatsoever."

There are two cases which appear to be opposed in principle to the *Spayd* case. In *Pfoh* v. *Whitney* (Ohio App.), 62 N.E. 2d 744, the plaintiff had been suspended from the union for supporting Wendell Wilkie for President when the union officially supported Roosevelt. Plaintiffs had circulated a letter with a letterhead which appeared as follows: "Labor's Wilkie for President National Committee." It was signed:

> "E. E. Pfoh
> E. E. Pfoh, Past President
> B. of R. T. Lodge No. 132."

The constitution of the union provided for expulsion for sending out circulars without the approval of the president of the union. The court held for the union. But the case is not persuasive here for a number of reasons. First, it is pointed out that "No claim was made by the plaintiff that [the constitutional provision] was in violation of the laws of the land, or that it was not a valid part of the constitution." (P. 750.) His sole claim seems to have been that he did not intend the letter for circulation, and the contrary was found to have been the fact. Secondly, the offending letter hinted broadly that it was sent by a union member in his representative capacity. Thirdly, the opinion reveals the underlying ground of decision to be that since the constitution authorized expulsion for this particular act, and the proceedings were regular, plaintiff cannot complain. This case is analyzed by *Summers, supra,* at page 1063 as an aberrant result of the contract theory of the relationship between the union and its members. According to the theory, no offense is punishable which is not mentioned in the constitution and by-laws. The rule has led to acceptance of the converse, that if it is in the constitution or by-laws, the courts can't interfere. *Pfoh* is said to be an example of this questionable approach, against which most courts are said to have rebelled.[4] The other case, *Harrison* v. *Brotherhood of Ry. & S.S. Clerks* (Ky.), 271 S.W.2d 852, involved an action for reinstatement following expulsion. Plaintiff had written a letter to eight Congressmen soliciting their votes and influence against the adoption of a measure which would permit union shops. The petition was made by plaintiff as an official and representative of the union, in violation of the union constitution which limited determination of legislative policy to higher officials and prohibited the petitioning of the Legislature "in any capacity except that of a private citizen" in opposition to the official policy. The constitutional question was resolved upon the quoted phrase, with the statement that "appellant's right of freely communicating his thoughts and opinions as an individual . . . is not impaired." (P. 854.) The expulsion was accordingly upheld. The case appears to be merely a holding that a union member cannot misrepresent the union's political position in violation of its rules and seek aid from the court to escape punitive action.

---

. [4]*Williams, supra,* at p. 832, describes *Pfoh* v. *Whitney* as an aberration which was probably decided by a rabidly pro-F.D.R. judge.

In deciding whether a union may, *under these facts,* be permitted to penalize a member for engaging in political activity which the union opposes, certain considerations must be brought to light: (1) the interest of the community and the individual in the latter's membership; (2) the importance to the community of the individual's untrammeled right to express himself on political questions; (3) the interest of the union in excluding obnoxious members; (4) the interest of the union in speaking with one voice; (5) the nature of the political activity and the manner of its conduct. As to the first consideration, the value of membership to the individual has already been demonstrated. And to the extent that industrial democracy is important to the community, its interest is also manifest. (Cox, Law and the National Labor Policy [1960] p. 110.)

With respect to the second, few subjects in the history of western civilization have drawn such a unanimity of support. In a dissenting opinion Mr. Justice Brandeis observed, "The right of a citizen of the United States to take part, for his own or the country's benefit, in the making of federal laws and in the conduct of the Government, necessarily includes the right to speak or write about them; . . . Full and free exercise of this right . . . is ordinarily also his duty; for its exercise is more important to the Nation that it is to himself." (*Gilbert* v. *Minnesota,* 254 U.S. 325, 337-338 [41 S.Ct. 125, 65 L.Ed. 287].) In *Sweezy* v. *New Hampshire,* 354 U.S. 234, 250-251 [77 S.Ct. 1203, 1 L.Ed.2d 1311], it was said, "Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association. . . . History has amply proved the virtue of political activity by minority, dissident groups, who innumerable times have been in the vanguard of democratic thought and whose programs were ultimately accepted. . . . The absence of such voices would be a symptom of grave illness in our society." Further quotation is unnecessary. Suffice it to say that the unlimited freedom to express political views is the very heart of a democratic body, pumping the lifeblood of ideas without which our system could not survive.

As to the union's interest in excluding obnoxious members, it would be completely unrealistic to assume that unions are composed of like-thinking individuals. It is only when dissident views are expressed in a forum where they have a chance of acceptance that the member becomes "undesirable." But expulsion cannot serve to quiet the individual. It can

only serve to intimidate those who remain. While this, too, might be a legitimate objective under some circumstances, the very question to be decided is whether the community ought to tolerate that result in *these* circumstances.

As to the interest of the union in presenting a unified front, this cannot be gainsaid. And where activity of the union is directly designed to attain economic goals, such as the decision to strike or not to strike, or adherence to the collective bargaining agreement, judicial regard for this interest has already been demonstrated. And it is no doubt true that economic and political objectives of unions frequently cannot be treated as completely separate things.[5] The *DeMille* case is an outstanding example of judicial cognizance of the connection. But still a distinction should be made in this context. Where purely economic activity is concerned, the community interest is not so deeply involved as it would be if the entire union membership in the nation were limited in its political expression (on matters of legitimate union interest) to the opinions of the majority or the union leadership. If this were the case we would be deprived of an immeasurably important source of political thought. Furthermore, so long as the individual member purports to represent only himself, and not his union, the union's public position is not diluted.[6]

---

[5]Archibald Cox, professor of law at Harvard and presently Solicitor general of the United States, says, ''It is difficult, if not impossible, to separate the economic and political functions of labor unions. Right-to-work laws affect union organization and collective bargaining. Legislation subjecting unions to the antitrust laws or confining their scope to the employees of a single company would greatly weaken their bargaining power, if it did not destroy them altogether. Although it seems unlikely that the LMRDA will seriously impair the strength of labor organizations, many union leaders hold an opposite view which time may prove correct. Political action in these spheres of union interest is hardly more than incidental to the union's economic activities. A similar link exists even when a union takes political action upon a broader front. The basic philosophy of a President and his party affects appointments to agencies like the National Labor Relations Board, which in turn exerts tremendous influence upon the course of labor relations. Even the tariff impinges on labor negotiations. The bargaining power of the Hatters Union, for example, is affected by the competition of low-cost foreign goods.'' (Cox, Law and the National Labor Policy [1960] p. 107.)

[6]''For many years labor unions were extraordinarily fragile. Dissent created strains which might easily cause disintegration. The risks of dissension were increased by the unions' vulnerability to attacks by employers. Conformity to group decisions was the price of survival. It seems doubtful, however, whether this factor should be given as much weight under modern conditions. Labor unions have achieved strength and stability. The centrifugal forces are counterbalanced by full-time

This brings us to the question of the nature of the political doctrine propounded and the manner in which it is advocated. We are not called upon to decide what the result would be if a member was expelled for advocating repeal of the Wagner Act or the abolition of unions. Only the right-to-work law is here involved. The union argues that it may reasonably consider such a law seriously inimical to its interests. This is certainly not an unreasonable position, and, in addition to the *DeMille* case, many authorities agree. (Toner, *Right-to-Work Laws: Public Frauds,* C.C.H. Labor L.J., 193 [March 1957]; Cohen, *Operating Under Right-to-Work Laws,* C.C.H. Labor L.J. 574 [Aug. 1958].) But there is substantial respectable opinion to the contrary. Cox, *supra,* at page 110 says, ''The member who acts as a strikebreaker may be guilty of treason, but one can believe in right-to-work laws and remain a good trade-unionist.'' (See also Brandeis, Symposium on *Peace with Liberty and Justice,* 2 Nat. Civic Federation Rev. No. 2 [May 15, 1905] p. 16, cited in *American Fed. of Labor* v. *American Sash & Door Co.,* 335 U.S. 538, at pp. 551 and 552 [69 S.Ct. 258, 93 L.Ed. 222, 6 A.L.R.2d 481]; Torff, *The Case of Voluntary Union Membership,* 40 Iowa L.Rev. 621; Sultan, Right-to-Work Laws: A Study in Conflict, Inst. Ind. Rel., 1958.) There being such a disparity of opinion as to the long-run effect of voluntary unionism, the question becomes not whether the union is justified in its opinion, but whether the point is sufficiently debatable so that society's interest in the debate, together with the individual's right to speak freely on political matters, outweighs the union's interest in subduing public dissent among union members.

With respect to the manner in which the campaign was conducted, petitioners did speak as union members. But they did not purport to represent their union as did the expelled members in the *Pfoh* and *Harrison* cases.

It could not be more apparent where the balance lies. On this point, Cox, *supra,* page 111, has this to say: ''It needs no argument to demonstrate the importance of freedom to pursue personal political activities. It begs the question to say that a man has a right to engage in whatever political activity he wishes but no right to be a union member. The question is whether there will be an excessive loss of freedom

officials, professional staffs, and, often, closely-knit internal organization. Furthermore, disagreement upon political issues, even upon the desirability of a right-to-work law, does not go to the heart of a labor union's functions.'' (Cox, *supra,* note 5 at p. 110.)

if unions are permitted to make political conformity the price of membership. Bearing in mind the size and importance of unions in industry as well as their growing interest in politics, it seems apparent that the total loss would be great indeed if a significant number of large labor organizations adopted the attitude of the International Association of Machinists. It would also work serious changes in our political system if individuals can be insulated from direct political action by the decisions of organized groups even though the decisions are reached by majority rule." It is therefore clear that, at least where the political activity of the member is not patently in conflict with the union's best interests, the union should not be permitted to use its power over the individual to curb the advocacy of his political views.

In support of its contention that a union has the same right as any voluntary organization to determine its membership, respondent cites *Steele* v. *Louisville & N.R. Co., supra; Ross* v. *Ebert*, 275 Wis. 523 [82 N.W.2d 315] ; and *Oliphant* v. *Brotherhood of Locomotive Fire & Eng.*, 156 F.Supp. 89. The *Steele* case merely interpreted the Railway Labor Act as requiring that a union designated as sole bargaining agent must represent all members of the bargaining unit without discrimination—specifically nonmember Negroes. In dictum it was stated that the Railway Labor Act did not deny a union the right to determine eligibility of its membership. The *Ross* and *Oliphant* cases held that a union cannot be compelled to take members it does not want. Again Negroes were involved. But these cases did not involve the policy question here presented. Exclusion of minority groups does not have the coercive effect which inheres in the threat of *expulsion* for advocacy of political views.[7]

Respondent further contends that petitioners failed to exhaust their internal remedies. They conducted their

---

[7]It is interesting to note that with respect to the right of an employer to attempt to influence his employee's political activities, the California legislature has spoken.

Labor Code, section 1101, reads: ''No employer shall make, adopt, or enforce any rule, regulation or policy: . . .

''(b) Controlling, or directing, or tending to control or direct the political activities or affiliations of employees.''

Section 1102 reads: ''No employer shall coerce or influence or attempt to coerce or influence his employees through or by means of threat of discharge or loss of employment to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity.''

internal appeal through to the Executive Council. Following the decision of the Executive Council to uphold the expulsion, petitioners were notified that their expulsion was "final and complete." However, the union constitution provides that an appeal lies from a decision of the Executive Council to the Grand Lodge Convention. The Executive Council decision was rendered on July 8, 1959. The Grand Lodge Convention was scheduled to meet in September of 1960, 14 months later. In our opinion this constituted an unreasonable delay.[8] A similar conclusion was reached in *Van Hook* v. *Southern Calif. Waiters Alliance,* 158 Cal.App.2d 556 [323 P.2d 212]. In that case a nine-month delay until the Convention met, together with ambiguities in the union constitution with respect to the right of appeal, were held to excuse the union member from further internal appeal. Professor Summers, in his article on the *Legal Limitations on Union Discipline* (in 64 Harv.L.Rev. 1049, at p. 1086), states, "The courts have uniformly recognized that if exhaustion of union appeals would create too great a delay, the disciplined member can have immediate access to the courts." He points out that this is entirely proper because of the plight of the ex-member who must do without the benefits of union membership for perhaps a protracted period of time. Professor Williams, in his aforementioned article (in 32 Tex.L.Rev. 826, at p. 830), suggests that the requirement of an appeal to the National Convention is burdensome *per se.* As may be expected, judicial opinion has varied when faced with the question of what is too long. According to Professor Summers, a year is generally held to be too much time. In our opinion 14 months is too great a delay, particularly in view of the fact that petitioners had no reason to expect a favorable result.[9]

The judgment is reversed.

Ashburn, J., and Herndon, J., concurred.

A petition for a rehearing was denied December 8, 1961, and respondents' petition for a hearing by the Supreme Court was denied January 9, 1962.

---

[8]The trial court's finding of fact to the contrary is merely a conclusion of law, with which we disagree.

[9]Petitioners did pursue their appeal and lost after this action was filed.