## Dudek *v.* Pittsburgh City Fire Fighters, Local No. 1, Appellant.

234

Argued March 16, 1967. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Stanford A. Segal*, with him *Gatz, Cohen & O'Brien*, for appellant.

*Ben Paul Jubelirer*, with him *Stuart E. Savage*, for appellee.

OPINION BY MR. JUSTICE MUSMANNO, April 25, 1967:

Henry G. Dudek, and 17 others, plaintiffs in this case, are employed as firemen by the City of Pittsburgh and are members of the Pittsburgh City Fire Fighters, Local Union No. 1. Because of differences between the union and the City of Pittsburgh over the scale of wages, the union detailed pickets to patrol the entrance to the City-County Building in Pittsburgh, where the mayor and the city council maintain executive and legislative offices.

After this picketing had continued for an unspecified time, the union, on September 27, 1963, adopted a motion which required all members of the organization to picket, in addition to the City-County Building, all "Democratic candidates for City Council every time they address a Ward meeting." Charles Franciscus, a candidate for alderman in the 29th Ward of the city, and a member of the union, moved, at a general meeting of the union, that the members of the local not picket in the 29th Ward where no elected councilman or the mayor was appearing as a candidate for reelection. The motion was defeated. Throughout the entire period of the disagreement between the city and the defendant union, no incumbent councilman appeared as a candidate for reelection in the 29th Ward. Nevertheless the defendant caused Democratic rallies in that ward to be picketed.

When the union informed the plaintiffs they were to appear on certain dates and at certain places to picket city ward meetings, the plaintiffs refused to make such an appearance, asserting that picketing of the character indicated went beyond the proper scope of the union since it involved the harassment of persons not involved in the city-union quarrel, that it encompassed infringement of the plaintiffs' rights under the Constitution, and that the order, under which the union was acting, was void because of unreasonableness.

Charges were brought by the union against the plaintiffs for failure to abide by its order, the men were tried under union procedure, and found guilty of violating an order of the union, which now imposed a fine of $75 against each of the plaintiffs, except two who were sentenced to pay $60 each. The plaintiffs, after posting $50 each, in accordance with union rules, appealed to the International President of the International Union. The president reversed the decision of

the local union which, in turn, appealed to the International Executive Board and to the International Convention. The decision of the president was reversed, and the plaintiffs filed a complaint in equity in the Court of Common Pleas of Allegheny County, asking for an injunction against the union to restrain the collection of the fines and the carrying out of the union order of September 27, 1963.

The court of common pleas granted the injunction and the defendant union has appealed to this Court, asserting that a labor organization or any organization has the right to "enforce the lawful demands of the majority" by placing fair and reasonable penalties on those of its members who do not accept the decision of the majority.

It cannot be disputed that a union may require its members to cooperate in the achievement of its legitimate objectives. The success of any organization is dependent upon the cohesiveness of efforts of those who compose it. But the modus operandi in achieving the objectives must conform to the law of the land. In order to compel the obedience to the order of September 27, 1963, the union threatened the members with imposition of fine, or suspension and expulsion of union membership. This order of the union is not sustainable in the law.

The provisions of the International Constitution, under which the plaintiffs were convicted, provided that members were amenable to discipline under §§1, 10 and 12 of Article XV, if they refused to abide by the provisions of the constitution, by-laws and decisions of the union. But this disciplinary right of the union is not absolute.

The very article of the union's constitution, under which it proceeded in its prosecution of the plaintiffs, places a limitation on the slavish obedience of union members by saying that it is only refusal or failure

to obey orders *"without justifiable cause"* which will subject the member to penalties. Obviously, if there is justifiable cause for refusal, no sanctions may follow.

The plaintiffs contended throughout the union procedure, and in the proceedings in the court below, that they had "justifiable cause" to refuse to comply with the order of September 27, 1963. Did that order meet the criterion of reasonableness? In the case of *Spayd v. Ringing Rock Lodge,* 270 Pa. 67, this Court said: "We have often said that the by-laws, rules and regulations of these artificial bodies will be enforced *only when they are reasonable*; and they never can be adjudged reasonable when, as here, they would compel the citizen to lose his property rights in accumulated assets, or forego the exercise of other rights which are constitutionally inviolable. Defendant lodge is part of a beneficial organization, and there is a finding that plaintiff has a substantial property interest therein; under these circumstances, it will not do to say that he can freely regain full liberty of action, at any time, by disassociating himself from the order; but, even if he could, the rule, as construed by defendants, would still be discountenanced, and void in law." (Emphasis supplied.)

The defendant union argues that the plaintiffs could have regained their full liberty of action by withdrawing from the union. But a person's legal rights may not be summarily disposed of by saying to him that if you don't like our ship you may get off. No one has the right to impose a condition, the refusal to accept which will deny the refuser invested rights,—property, as well as academic.

The plaintiffs have very valuable rights in their union. In the first place, union membership is a gilt-edged security for tenure. Membership entitles the member to $1500 life insurance until 65, and at the

retirement age of 65 he receives a paid-up $1000 policy. Active members are assured sick benefits at $10 per week for 26 weeks. Additional $150 death benefits are payable to beneficiaries of deceased members. All these are not abstractions or theories. They mean loaves of bread in the pantry, clothes in the wardrobe, medicine in the bathroom cabinet. Union membership is literally blood in one's arteries because among the other benefits accruing to members, they have the right to draw from a union-administered blood bank.*

The defendant would suggest that the plaintiffs have drawn fluid from the reservoir of life itself as a price for refusal to obey the dictates of the union order of September, 1963. The law will not require so exorbitant a remuneration for the privilege of enjoying the rights of citizenship.

In the case of *Manning v. Klein,* 1 Pa. Superior Ct. 210, a member of a barbers' union was expelled because he had advocated, as a member of a Sunday Closing Association, that barber shops be closed on Sunday. When the plaintiff brought an action to be restored to the union, the defendant union argued that the plaintiff had violated the by-laws of the union and, therefore, had no rights the union was bound to recognize. The Superior Court ordered the plaintiff to be reinstated in the union, declaring: "If this were simply a question of sentiment, it might be that, even under such circumstances, courts would hesitate to interfere, but the plaintiff below had unquestioned property rights involved which the law is bound to protect. He

---

* "The right to earn a living is deemed to be property within the concept of the Fifth Amendment to the Federal Constitution, and a union, in the service of its interest, may not deprive a person of his constitutional rights of liberty and property . . . Consequently, it has been held that membership in a union is a property right which the courts will protect." *DeMille v. American Federation of Radio Artists*, 139 Cal. 2d 139, 153-4, 187 P. 2d 769, 778.

had for a number of years paid into the treasury of the association to meet its obligations to other members. He thereby acquired the right, in case of sickness or accident, to secure like treatment on the part of the association, and, in case of death, provision for his family. It is not a light matter to be deprived of such privileges and courts will carefully scan the steps by which such a conclusion is reached."

There is no doubt that picketing is a form of speech which is protected under the First Amendment to the Constitution of the United States and by Article I, §7 of the Constitution of Pennsylvania. A picket speaks through the banner he carries or the sign he displays. Even by his presence alone he may declare that he is objecting to a certain state of affairs. The union in this case, therefore, argues that to require members to exercise public speech through picketing is not to deny freedom of speech but to implement it. However, the defendant fails to realize that the right to speak carries with it its inevitable counterpart, the right not to speak. If freedom of speech meant forced speech, American skyscrapers to garrulity would make of the Tower of Babel a mute mud hut in comparison.

This Court said in *Wortex Mills v. Textile Workers*, 369 Pa. 359, 363: "Freedom of speech is not absolute or unlimited—for example, a man may not slander or libel another; he may not publicly blaspheme the Deity; he may not engage in loud speaking through sound trucks during certain hours or in certain parts of a city; and he may not assemble with others to commit a breach of the peace or to incite to riot or to advocate the commission of crimes. Freedom of speech gives no right of intimidation or coercion and no right to damage or injure another's business or property, except where this results indirectly from peaceful and orderly picketing for a purpose which the law regards as legitimate and lawful."

It is just as illegal to compel one to speak when he prefers to remain silent as it is to gag one when he wishes to talk. The torture of the third degree was a coercion to speech. It was because of the heinous and often barbarous methods employed to force a tongue into action when its owner knew that closed lips were his only safety, that our forefathers wrote into the Constitution the 5th Amendment which protects his silence. "The liberty to write or speak includes the corresponding right to be silent and also the liberty to decline to write, and such rights, as well as the right of privacy, or the right to speak only when one may speak freely, are insured under this constitutional provision." (First Amendment) 11 Am. Jur. §319.

We said in *Spayd v. Ringing Rock Lodge,* supra, that the regulations and by-laws of organizations such as the one under consideration, will be enforced only when they are reasonable. As far back as 1849, this test was applied in a case where a member of a beneficial association was expelled because he joined a volunteer corps to serve in the Mexican War in violation of a by-law of the association which declared that no member should voluntarily "enlist as a soldier or enter on board any vessel as a seaman or mariner." This Court held that the expulsion was unreasonable because "The relator became a soldier, but not a regular one; in other words, he did not embrace the profession of arms as a business. He was a citizen soldier."

The Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. §411(a)(2) provides: "Every member of any labor organization shall have the right to meet and assemble freely with other members. . ." Meeting and assembling under compulsion is not meeting and assembling *freely,* especially when that meeting is ordered to produce coercive speech against persons in no way aligned against the union in the

expression of their complaint. The alleged grievance of the union was with the mayor and the then current city council. The retaliatory action was directed at all those who might be candidates for council, even those who had never been councilmen. In addition, the picketing was aimed at candidates for office in no way involved in the friction between the union and the city. This meant, therefore, that the plaintiffs would be compelled to oppose by signs, and by picketing, candidates for whom they might well have a decided. preference. Such a regulation imposes a blanket opposition which is so contrary to the fundamental rules of fairness that it cannot possibly pass muster under the criterion of reasonableness.

One of the plaintiffs, Hugh E. Coll, testified that he was a Democratic committeeman and had worked for the Democratic Party since he was 16 years of age. He said that he did not think it "would be fair to the people who elected me to picket the party they voted for." He said that he had performed picket duty at the City-County Building because he believed he was there picketing his employers and also "hunting" the support of the public for the union's effort to obtain "more money and better working conditions," but that the requirement to picket a "political party" was an "infringement" of his rights as an American citizen.

In addition, the situs of the picketing was wrong. The arena of the conflict between the union and the city was in the city hall, not in the outlying political territory. If, in a battle, a bullet ricochets and hits someone far removed from the battlefield, it would be difficult to assign fault for the chance wounding. But, here, the wounding would not be by chance. The defendant trained its batteries on the city wards and on persons not even remotely concerned with the controversy; the artillery shots were aimed at candidates running for office which could not conceivably be brought

into the argument between the union and the city council. All this means unreasonableness, and all this means illegality under the law of the Commonwealth.

The action of the plaintiffs in refusing, by the exercise of "justifiable cause", to obey the crucial union regulation did not place the union in "disrepute with other labor organizations, employers or the public," as was charged under §10, Article XV. If any disrepute followed the enactment of the regulation, it was caused by those who sponsored and supported a regulation so out of keeping with the reasonableness requirement of union regulations.

Finally, the plaintiffs were found guilty of "conduct unbecoming a member of this Association." The record shows that the conduct of the plaintiffs was respectful and dignified. It measured up to the American standard of decorum and good behavior. In the exercise of judgment of "justifiable cause" they remained away from the ward meetings. It is possible to gauge the conduct of a person who is before one's eyes, it is in order to appraise the demeanor of a person who is visible, one can rate a person on his attitude by watching him perform or listen to him speak, but it is impossible to say that a person's conduct is unbecoming when he cannot be seen, felt or heard. The plaintiffs were convicted for doing nothing under an order which did not legally compel them to do anything. They were convicted in a vacuum. Fines were imposed for absence when the law did not require presence, punishment was ordered for an enforced procedure which would have constituted a denial guaranteed under the laws of the union, as well as the laws of the Commonwealth.

Nothing in this opinion is to be construed as denying to labor unions the right to discipline recalcitrant members in accordance with their constitutions and by-laws consonant with standards which meet the laws of the land. The Supreme Court of Wisconsin well said

in *Local 248, U.A.A. & A. I. W. v. Wisconsin Employment Relations Board,* 11 Wis. 2d 277 (1960) : "A union without power to enforce solidarity among its members, when it resorts to a strike in an effort to force an employer to agree to its collective-bargaining demands, is a much-less-effective instrument of collective bargaining than a union which possesses such power. . . .

"'A union must have authority to discipline its members, otherwise it will have no power to bargain effectively.'"

We find in this case that the motion of September 27, 1963, violated the rules of reasonableness which guide the interpretation of orders, regulations and by-laws of voluntary associations, that it imposed mandatory picketing beyond the periphery of the legitimate controversy, and that the sanctions imposed under its scope were, therefore, null and void. The decree of the court of common pleas is affirmed, with costs on the appellant.

Mr. Justice JONES and Mr. Justice EAGEN concur in the result.

———

CONCURRING OPINION BY MR. JUSTICE COHEN:

I concur in the result reached by the majority on the ground set forth in the able opinion of the International President: the legality of the objective sought by the union did not overcome its unlawful attempt at coerced expression by individual union members contrary to their constitutional rights of free speech and political belief. I recommend for more intensive analysis three law review articles: Kamin, Residential Picketing and the First Amendment, 61 Nw. U.L. Rev. 177 (1966); Cox, The Role of Law in Preserving Union Democracy, 72 Harv. L. Rev. 609 (1959); Summers, Legal Limitations on Union Discipline, 64 Harv. L. Rev. 1049 (1951).

My concurrence in the result here does not in any way mean that I do not fully support the position as stated in *Local 248, U.A.A. & A.I.W. v. Wisconsin Employment Relations Board,* 11 Wis. 2d 277, 288, 105 N.W. 2d 271, 276 (1960): "A union without power to enforce solidarity among its members, when it resorts to a strike in an effort to force an employer to agree to its collective-bargaining demands, is a much-less-effective instrument of collective bargaining than a union which possesses such power. . . .

" '*A union must have authority to discipline its members, otherwise it will have no power to bargain effectively.*' " (Citing 1 Vill. L. Rev. 190 (1956)). There has been argued in the United States Supreme Court and is pending decision the problem raised in *National Labor Relations Board v. Allis-Chalmers Manufacturing Company and International Union, UAW-AFL-CIO (Locals 248 and 401),* October Term, 1966, No. 216.* Whether a union which fines a member for crossing a picket line established in support of a lawful strike authorized by a majority of the union's membership, and attempts to collect such fine by court action, thereby restrains or coerces an employee in the exercise of a right guaranteed by Section 7 of the National Labor Relations Act, in violation of Section 8(b)(1)(A) of the Act.

This problem, while of national interest, has no application to the instant case, since the Pittsburgh City Fire Fighters are not subject to the National Labor Relations Act.

---

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

This case requires our Court to resolve a conflict between the individual's right of free expression[1] and

---

[1] U. S. Const. Amend. I; Pa. Const., Art. I, §7.

* Reporter's Note: 388 U.S. 175, 87 S. Ct. 2001 (1967).

right of individuals to associate effectively for the furtherance of a common purpose.[2] The untrammeled exercise of each of these rights is of fundamental significance to the functioning of any complex society which aspires to be a free one.

For individuals to exercise their right to unite effectively for a common purpose the voluntary groups which they form must be able to discipline and expel members whose conduct obstructs the realization of the common purpose. The rights of discipline and expulsion are not, of course, absolute; instances arise in which exercise of such rights affront other legal principles of equal or greater importance. Yet the constitutional importance of a group's right to discipline members in furtherance of its common purpose makes it incumbent on courts to minimize judicial interference with such rights. And the ability of a member to resign from such an association at will insures that such restrictions on his freedoms as are imposed by his membership are freely undertaken.

On the other hand, the principle of free speech is deeply rooted in our law and in our vision of a free society. That principle is as much violated by requiring a man to speak what he does not believe, as it is by prohibiting him from expressing what he does believe. The picketing duties sought to be imposed on appellees in this case certainly constitute speech within the meaning of constitutional guarantees.[3] Finally, it should be noted that the language of our Constitution prohibits not only state interference with free expression but also coercion of speech from sources other than the state.[4] "The free communication of thoughts

---

[2] Pa. Const., Art. I, §7.

[3] See *Pennsylvania Labor Relations Bd. v. Chester & Delaware Counties Bartenders Union*, 361 Pa. 246, 64 A. 2d 834 (1949).

[4] See, e.g., *Spayd v. Ringing Rock Lodge*, 270 Pa. 67, 113 Atl. 70 (1921).

and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty." Pa. Const., Art. I, §7.

The opinion of the Court in this case appears to rest on two approaches which I think we would do well to avoid. First the Court appears to say that the fines (backed by a threat of expulsion) imposed on appellees may not be enforced because of appellees' vested property rights in various union funds. Quite correctly the Court relies on *Spayd v. Ringing Rock Lodge,* 270 Pa. 67, 113 Atl. 70 (1921) for this view. In light of the constitutional importance with which I view the right of a voluntary association to promote its legitimate common purpose, by determining its own membership, however, I believe it would be unnecessary and unwise in most cases to enjoin the imposition of discipline or expulsion merely to protect vested property rights. Such rights can be equally well protected by simply requiring the group to compensate the disciplined member for those losses incurred which courts feel are in violation of proprietal or contractual rights. Compensatory rather than injunctive relief will avoid in large part any interference with a group's right to exclude from its ranks members who obstruct its legitimate common purposes. Moreover, such an approach is far more consistent with the practice of equity in declining to afford injunctive relief unless relief in damages would not remedy asserted injury.[5]

The second approach by the Court in which I find myself unable to join, is its conclusion that picketing of the ward meetings was unreasonable. Putting aside

---

[5] See the excellent discussion in Summers, Legal Limitations on Union Discipline, 64 Harv. L. Rev. 1049, 1054, n.21 (1951). See generally id. at 1050-74.

completely the question of whether any meaningful distinction can be drawn between union "political" and "economic" activities, see *International Ass'n of Machinists v. Street*, 367 U.S. 740, 797-819, 81 S. Ct. 1784, 1814-25 (1961) (FRANKFURTER, J., dissenting), it seems to me that picketing here was reasonably related to the union's economic objectives. After all, the employers whose conduct the union were seeking to affect were the mayor and members of city council. The power of these individuals to affect appellees' terms of employment ultimately flows from the electorate and more immediately from those bodies, such as ward committees, which organize the diffuse wishes of the electorate into an articulate message understandable by its elected representatives. To say, therefore, that it was unreasonably outside the union's central purpose for appellees, after trying and failing to secure their demands at the offices of the mayor and city council, to carry their picketed message to the source of the mayor and city councilmen's power in the wards strikes me as distinctly unsound. As well, one might find unreasonable the picketing of a stockholders meeting by a union whose picketing of the management offices of a private business had failed to induce the management to negotiate.

The basis for my concurrence in the majority's result is my belief that a realistic appraisal of modern social conditions shows that labor unions are associations to which the adjectives voluntary and private may only be applied with certain qualifications. That this is so where a union is designated as an exclusive bargaining agent by virtue of a statutorily authorized process seems clear. But even where a union is not so vested with power by government, it is not realistic to view it as voluntary and private in the same sense as other groups are. *Mitchell v. International Ass'n of Machinists*, 196 Cal. App. 2d 796, 799, 16 Cal. Rptr. 813,

814 (2d Dist. Ct. App. 1961); Summers, Legal Limitations on Union Discipline, 64 Harv. L. Rev. 1049, 1050 (1951); cf. Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich. L. Rev. 819, 830, 837 (1960).[6] Thus I believe that just because a court should not enjoin the discipline or expulsion of a member of a voluntary and private association for failure to comply with a certain policy imposed by the membership does not mean an injunctive remedy would not necessarily be appropriate where the association involved is a labor union.

Courts have been confronted before with a union's claim to discipline members whose exercise of the right of free speech violated union policies. Unfortunately most of the earlier cases have been resolved on the basis of contractual fictions, the "reasonableness" of the union's policy in light of what the courts believe should be the union's "economic" objective[7] or on statutory grounds.[8] Such resolutions are not overly helpful in the task, as I conceive it, of reconciling the individual union member's right to free speech with the union's right to determine its membership.

In *Mitchell v. International Ass'n of Machinists,* supra, however, the court did resort to such a balancing test.[9] The issue in *Mitchell* was the union's right to expel two members who had violated union rules by advocating, in their individual capacities, passage of a right to work law. The court upheld an injunction barring expulsion on the ground that the breach

---

[6] See also *Allis-Chalmers Mfg. Co. v. NLRB,* 358 F. 2d 656 (7th Cir. 1966), cert. granted, 87 S. Ct. 54 (1966).

[7] See Summers, supra note 5, at 1050-74.

[8] See, e.g., the opinion of the Court in *International Ass'n of Machinists v. Street,* 367 U.S. 740, 81 S. Ct. 1784 (1961).

[9] This is also the approach of Mr. Justice FRANKFURTER dissenting in *International Ass'n of Machinists v. Street,* supra note 8.

of union discipline was not so inimical to the broad range of objectives espoused by the union as to warrant the imposition of a restraint of free speech. While it may be contended that the breach of union discipline here was more inimical to the union's purposes than in the *Mitchell* case, I believe that the *Mitchell* analysis sustains the result reached by the Court here. Indeed the appellees' conduct, while arguably decreasing the effectiveness of the union's campaign of bringing pressure to bear on the mayor and city council, was not the least inimical to the broader purpose of the union's endeavor. By contrast, the ability of the union to require its members to express themselves in a way in which they do not believe is to my mind even more offensive to constitutional protection of freedom of speech than would be a prohibition on their ability to express what they believed. It is by taking this into consideration with the fact that a member's relation to his union is not of the same voluntary nature as that of a member to other private associations that I come to the conclusion that we must affirm the decision of the court below.