129 N.J. Super. 379 (1974)
324 A.2d 35
RICHARD J. ZELENKA, PLAINTIFF-APPELLANT,
v.
THE BENEVOLENT AND PROTECTIVE ORDER OF ELKS OF THE UNITED STATES OF AMERICA, ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 3, 1974.
Decided July 11, 1974.
*380 Before Judges CONFORD, HANDLER and MEANOR.
Mr. Peter A. Buchsbaum argued the cause for plaintiff-appellant.
Mr. Edward W. Connolly argued the cause for defendants-respondents (Messrs. Connolly, Vreeland & Connolly, attorneys).
*381 The opinion of the court was delivered by CONFORD, P.J.A.D.
Plaintiff sustained an adverse summary judgment in the Superior Court, Chancery Division, in his action to be restored to membership in defendant Ridgewood Lodge #1455 of defendant The Benevolent and Protective Order of Elks of the United States of America (Elks) from which he had been expelled in March 1972 by direction of the Grand Forum (national judicial tribunal) of the order. He appeals.
Plaintiff was expelled after a hearing on the charge that he had in March 1971 violated section 183 of the Grand Lodge Statutes which provides, in substance, that no lodge or member should circulate any writing "regarding or pertaining to any question or subject" (presumably one of pertinence to Elks affairs) "without first submitting such * * * writing to the Grand Exalted Ruler [national] for his approval." Violation constitutes "contumacy," and contumacy is cause for expulsion. It is conceded by plaintiff, who is a Past Exalted Ruler of the lodge, that he did contravene the statute in that he, along with a brother member of the lodge, submitted for publication in the Bergen Record, a daily newspaper, a writing seeking to rally fellow Elks to an effort to amend the national rules of the order confining eligibility for membership to "white" male citizens so as to eliminate the racial requisite.[1] The essence of the communication is contained in the following excerpt:
*382 We, the undersigned, belong to what we feel is probably the greatest charitable organization in the country. * * * We have never been ashamed, when solicited, to apprise the public of our endeavors, but for the past months many of us Elks have had our consciences seared  for we have been accused by the public of discriminating  and they are right. * * * Let those of us that know that we are wrong change it  at the next Grand Lodge Convention. In keeping with this strong statement, probably the first public statement to be made to the public of such a nature, this concerned committee is calling a private organizational meeting of all Elks interested in amending Section 144 of the Grand Lodge Statutes of the Benevolent and Protective Order of Elks at the next Grand Lodge Convention.
The principal ground of attack by plaintiff upon the expulsion in the trial court, and the sole ground asserted on appeal, is that public policy is offended when an expulsion from a voluntary organization is the result solely of the exercise by a member of his right of free speech guaranteed by the State Constitution in Article I, Section 6 thereof. The trial court, in holding for defendants, expressed agreement with their position that the controlling issue was whether people in a free society did not have a right of free association and the correlative right to "exclude from their midst those individuals with whom they do not wish to associate," whatever the reason therefor.
In April 1971 a proper official of the Ridgewood Lodge brought charges against plaintiff for violation of section 183 of the statute. The presiding justice of the Subordinate (lodge) Forum sustained a "demurrer" filed by plaintiff, and he dismissed the complaint. Thereafter the Grand Exalted Ruler (national) appealed the matter to the Grand Forum, with the resultant hearing and judgment mentioned. No question is raised by plaintiff concerning the regularity of the proceedings in the order.
It is well established in this State as well as elsewhere that the courts will take jurisdiction to grant a remedy for a wrongful expulsion, as distinguished from an exclusion, from a voluntary association. Higgins v. American Society of Clinical Pathologists, 51 N.J. 191, 199 (1968); and see, *383 Trautwein v. Harbourt, 40 N.J. Super. 247, 259 (App. Div.), certif. den. 22 N.J. 220 (1956). While American and English courts have traditionally been loath to exercise visitorial powers upon voluntary organizations of a purely private nature, Chafee, "The Internal Affairs of Associations Not for Profit," 43 Harv. L. Rev. 993 (1930) passim, particularly those not affecting economic or civic interests, we have nevertheless observed in the Trautwein case:
* * * There can be no doubt as to the conspicuous place of social and fraternal organizations in American society, Abernathy, ["The Right of Association", 6 S. Car. L.Q. 32, 33 (1953)], nor as to the cachet attributed by almost every individual to membership in one or more particular voluntary associations, societies or groups, Comment, "Protection of Membership in Voluntary Associations," 37 Yale L.J. 368, 372 (1928); Annotation, 20 A.L.R.2d 344, 391. Professor Chafee has said that in comparison with "such emotional deprivations" as loss of membership in club, union, school or church, "mere losses of property often appear trivial." op. cit. supra (43 Harv. L. Rev., at p. 998). [40 N.J. Super. at 265]
We can take judicial notice that the Elks order, comprising about 1 1/2 million members, is one of the most widely located fraternal organizations in the country and that membership in it is highly prized in many communities. There is justification for inferring deep interest in his membership by the present plaintiff, a former head of his lodge. The personal value to plaintiff of his membership in the order thus calls for an evaluation of his relational interests, weighed against the assertion by the order of a constitutional right of selectivity in the private associations of its members. Cf. Trautwein v. Harbourt, supra, 40 N.J. Super. at 267; Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 179, 180, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), Douglas and Marshall, JJ., dissenting.
There is substantial and long-established authority to the effect that the courts will rescind the expulsion of a member of a voluntary association for violation of an internal rule offensive to public policy. Higgins v. American Society of Clinical Pathologists, supra, 51 N.J. at 202, and cases *384 there cited. The instant case falls within the category of those of such decisions which revolve about inhibition against free exercise by members of associations of their public or civic rights. Annotation, 14 A.L.R. 1446 (1921); cf. Annotation, 20 A.L.R.2d 344, 365 (1951); Mitchell v. International Ass'n of Machinists, 196 Cal. App.2d 796, 16 Cal. Rptr. 813 (D. Ct. App. 1961); Dudek v. Pittsburg City Fire Fighters, Local No. 1, 425 Pa. 233, 228 A.2d 752 (Sup. Ct. 1967)  Mitchell and Dudek prohibited expulsion and fining, respectively, for "free speech" involving opposition to union policies; Spayd v. Ringing Rock Lodge No. 665, 270 Pa. 67, 113 A. 70, 14 A.L.R. 1443 (Sup. Ct. 1921) (rescinding expulsion from a labor union caused by member petitioning legislature for repeal of a law favored by union); Gallaher v. American Legion, 154 Misc. 281, 277 N.Y.S. 81 (Sup. Ct. 1934), aff'd mem. 242 App. Div. 604, 271 N.Y.S. 1012 (App. Div. 1934) (expulsion of post held invalid, partly because based on post's opposition to national body's position on payment of soldiers' bonus); DeMille v. American Fed'n of Radio Artists, 31 Cal.2d 139, 187 P.2d 769 (Sup. Ct. 1947), cert. den. 333 U.S. 876, 68 S.Ct. 906, 92 L.Ed. 1152 (1948); Bernstein v. Alameda-Contra Costa Medical Ass'n, 139 Cal. App.2d 241, 293 P.2d 862 (D. Ct. App. 1956); cf. People ex rel. Schmitt v. Saint Franciscus Benevolent Society, 24 How. Pr. 216 (N.Y. Sup. Ct. 1862). Compare State ex rel. Barfield v. Florida Yacht Club, 106 So.2d 207, 211 (Fla. Ct. App. 1958), cert. den. 111 So.2d 40 (Sup. Ct. 1959), where a club member was held justifiably expelled for suing the club for personal injuries in an amount in excess of the organization's insurance coverage.
In the DeMille case, supra, although the court sustained plaintiff's expulsion from a radio artists' union for refusal to pay a union assessment to raise a fund to oppose a state constitutional amendment to abolish the closed union shop, the court stressed that the union had not prevented plaintiff's voting as he pleased on the amendment at the polls or *385 "from expressing publicly and privately his personal views in support of" the amendment. 187 P.2d at 775. His constitutional rights had not been infringed since "he had and continued to have absolute freedom to think or announce what views he pleased * * *." Id. at 777. These implications of DeMille became a holding by the same court in Mitchell v. International Ass'n of Machinists, supra, the court observing, "at least where the political activity of the member is not patently in conflict with the union's best interests, the union should not be permitted to use its power over the individual to curb the advocacy of his political views." 16 Cal. Rptr. at 819-820.
The most searching recent analysis of the general subject, "Developments in the Law  Judicial Control of Actions of Private Associations," 76 Harv. L. Rev. 983 et seq. (1963) persuasively observes:
* * * a court can most confidently adjudicate cases where the group imposes sanctions to enforce a rule or policy which prohibits or inhibits the performance by the individual of a duty or function for the performance of which the state normally relies on individual initiative. The role of the member as a responsible citizen  voter, witness, petitioner to the legislature  is protected. [at 1006]
The parties are in agreement that the issue here is not whether defendants were justified in expelling plaintiff for urging a change in the order's membership criteria. It is agreed that that was not the basis for the action, but rather plaintiff's expressing any opinion publicly on the matter at all, whether for or against the membership rule, without complying with the lodge regulation requiring approval of the expression by the Grand Exalted Ruler. Defendants urge that their policy against "public washing of private organizational linen" is a justified one and that plaintiff voluntarily sacrificed his right of unqualified freedom of speech to that extent when he joined the order. It may be observed, however, that the pertinent statute of the order does not preclude public expression by a member concerning a *386 fraternal matter if one man  the Grand Exalted Ruler  approves, and such approval is left to that official's absolute discretion.
There is probably no right more fundamental to the liberties of the people and to the successful functioning of the democratic system than that of individual freedom of expression. Undoubtedly that right is qualified in numerous respects by our public laws, and it is similarly qualified in respect of its exercise in the course of one's participation in the activities of private associations. A member of a Republican club, for example, could not expect to be allowed by the courts to campaign for a Democratic candidate and nevertheless remain immune to expulsion from the club for cause.
In the present case, however, defendants profess not to be concerned over plaintiff's espousal of reform of their membership policies. Moreover, nothing in the order's basic purposes and objects, as we read them expressed in the preamble of its constitution,[2] appears to be offended by a member's public plea for support by fellow members on an issue of the significance of racial qualifications for membership in the order without obtaining advance approval by the national head of the order. Nor do defendants contend to the contrary.
The question devolves, then, to one of offense to general public policy in a regulation of the character under consideration. We are not here faced with a regulation enjoining secrecy as to lodge ritual, or imposing restrictions on public discussion by members of matters of peculiar concern to the lodge or order, such as the amount of initiation or other *387 fees or the times and places of meetings, etc., with respect to which there is no general public interest or concern. On the other hand, the matter of racial qualifications for membership in an organization as large, as widespread and as socially significant as the Elks, albeit a private voluntary organization, is a subject conspicuously touching what interests and concerns the general public. See, e.g., Brunson v. Rutherford Lodge, 128 N.J. Super. 66 (Law Div. 1974).
The public policy undergirding the principle of free discussion of issues of such broad public interest as that mentioned, entirely independently of its constitutional sanction in respect of state abridgement, appears to us to far outweigh the private interest of defendants in restricting public discussion of such an issue by their members to those instances in which advance approval is vouchsafed by a single official at national headquarters.[3]
Since we find the regulation, as here applied, distinctly contrary to public policy, the expulsion of plaintiff cannot rest on its violation by him. He is entitled to a judgment restoring him to membership in the Ridgewood Lodge. To that end the cause is remanded to the Chancery Division and the judgment under appeal is
Reversed.
NOTES
[1] Effective September 17, 1973, section 144 of the Elks' Statutes and article VII, section 4 of its Constitution were amended, subject to ratification by subordinate lodges, eliminating the "white" membership requirement, with the proviso that the amendment should be effective only until either the Supreme Court of the United States should decide or the Federal Constitution should be amended to provide "that the right of the people to form associations and to determine membership qualifications shall not in any way be abridged, limited or denied."
[2] "To inculcate the principles of Charity, Justice, Brotherly Love and Fidelity; to promote the welfare and enhance the happiness of its members; to quicken the spirit of American patriotism; to cultivate good fellowship; to perpetuate itself as a fraternal organization, and to provide for its government, the Benevolent and Protective Order of Elks of the United States of America, ordains this Constitution."
[3] We are not implying our view would be different if the prohibition of public discussion were absolute. We leave that question to a case raising it.